1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF CALIFORNIA

9

10

GRANT HULET,

No.  1:23-cv-01217-KES-HBK

11

Plaintiff,

12

v.

ORDER DENYING DEFENDANTS'
MOTION TO DISMISS AND MOTION TO
STRIKE

13

COUNTY OF TUOLUMNE,
TUOLUMNE COUNTY SHERIFF'S

14

OFFICE, BILL POOLEY, CARL
BENSON, MARCUS GREEN,

(Doc. 35)

15

SHAYLENE GRAZIOSE, JESSICA
HOLT, SHELBY HEDGPETH, and

16

DANIEL GAVRILAS,

17

Defendants.

18

19

20

Plaintiff Grant Hulet brings this action against defendants County of Tuolumne, Tuolumne

21

County Sheriff's Office, Sheriff Bill Pooley, and sheriff's deputies' Carl Benson, Marcus Green,

22

Shaylene Graziose, Jessica Holt, Shelby Hedgpeth, and Daniel Gavrilas.  Doc. 29.  Hulet's claims

23

relate to the deputies' alleged use of excessive force when he was detained pretrial.  Defendants

24

move to dismiss certain claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and move

25

pursuant to Rule 12(f) to strike Hulet's request for treble damages under Cal. Civ. Code § 52(a).

26

Doc. 35 ("Mot. to Dismiss").  Plaintiff filed an opposition, Doc. 36 ("Opp'n"), and defendants

27

replied, Doc. 38 ("Reply").  Plaintiff filed a notice of supplemental authority on August 9, 2024.

28

Doc. 44.  This court has subject matter jurisdiction over this action because numerous claims arise

1

under federal law, 28 U.S.C. § 1331, the action is brought to secure deprivations of federal rights under color of state law, 28 U.S.C. § 1343(a)(3), and the state law claims are part of the same case or controversy, 28 U.S.C. § 1367.   For the reasons set forth below, the court denies defendants' motion to dismiss.

## I.    <u>Background</u>[1]

In December 2022, the month before the incident giving rise to this action, plaintiff Grant Hulet underwent a nerve transposition surgery on his left arm and elbow for an injury he sustained while working earlier that year.  Doc. 29, First Amended Complaint ("FAC") ¶ 20. Hulet was instructed to take pain medication, get physical therapy, and refrain from lifting more than five pounds.  *Id.*  Hulet's arm and elbow remained injured and swollen "up to and including on January 15, 2023."  *Id.*  In addition to the arm injury, Hulet suffered from the long-term effects of a severe back injury that occurred twelve years earlier and required two spine surgeries.  *Id.* ¶ 19.  Both his injured arm and back "remained sore and needed to be treated with care."  *Id.* ¶¶ 19–20.  Both injuries "substantially limited his ability to perform major life activities, including performing manual tasks, standing, lifting, bending, and working."  *Id.*

On January 15, 2023, Hulet was arrested at his home in Sonora, CA, by two deputies of the Tuolumne County Sheriff's Office for failing to appear at a court hearing involving two misdemeanor vehicle infractions.  *Id.* ¶ 21.  Hulet requested that he be allowed to bring his pain medication to the jail, which the deputies allowed.  *Id.* ¶¶ 23–24.  The arresting deputies drove Hulet to Dambacher Detention Center where he was booked, searched, and required to fill out forms and answer questions.  *Id.* ¶¶ 25–35.  Throughout the arrest, booking process, and incidents that gave rise to this action, Hulet repeatedly informed the six deputies who were present, all of whom are defendants here, of his pre-existing injuries and physical limitations.  *See id.* ¶¶ 24, 30, 32, 59–63, 88, 98, 121, 127, 139, 141, 147, 153, 158–165.  Hulet informed the deputies of his condition both verbally and on the booking forms, such as the "Intake Medical Screening" form

---

[1]  This recitation of facts is taken from Hulet's first amended complaint.  Doc. 29.  These allegations are assumed to be true for the purposes of the pending motion.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (allegations in a complaint assumed to be true for purposes of a motion to dismiss).

that he filled out in the presence of five of the defendants. *Id.*

About fifteen minutes into the booking process, Hulet began to express frustration with the deputies, the process, and the situation he was in. *See id.* ¶¶ 36–47. After what the complaint suggests was only a brief verbal exchange between Hulet and the deputies, *see id.*, defendant Shaylene Graziose asked defendant Jessica Holt, "So, you still want safety?" *Id.* ¶ 48. Holt nodded, confirming that the deputies should place Hulet in a "safety cell." *See id.* ¶¶ 48–49, 81, 90–93.

As Hulet asked what was going on, defendant Marcus Green grabbed Hulet's injured arm and directed him to come along. Hulet – as well as several of the other deputies – informed defendant Green that Hulet's arm was injured and that grabbing it caused pain. *Id.* ¶¶ 54–64. Prior to taking Hulet to the safety cell, the deputies instructed him to stand with his back against the wall so they could take his picture, as well as take photos of any identifying features, such as tattoos. *See id.* ¶¶ 57–79. The deputies then directed Hulet to the safety cell. *See id.* ¶¶ 79–81.

Upon seeing the safety cell, Hulet objected as there was nowhere to sit "in order to accommodate [his] recent injuries" and the floor was "covered in urine and filth." *Id.* ¶ 81, 83, 88. The deputies refused to put him in another room and directed him to remove his clothes and put on a "safety gown" smock. *Id.* ¶¶ 90, 93. He and the deputies then exchanged the following words:

> Green: Okay. You have to put this on.
>
> Hulet:  Why?
>
> Holt:   We're concerned for your safety. Now, I'll going to need all your clothes from you. We won't steal anything from you. It would be best if you could just take them off, nice and calm, one at a time, and hand them over.
>
> Hulet:  No. I'm not doing that.
>
> Holt:   Well, we're going to have to take them off for you, if you're not giving them up.'
>
> Hulet:  No. I'm sorry.
>
> Graziose: Okay. We're just –
>
> Holt:   We're not trying to hurt you.

3

Graziose: It's part of the process.

Holt:   I know you have injuries.

Hulet:  I'm not losing my dignity.

Graziose: We're not going to come in there –

Hulet:  I'm not losing my dignity. Listen –

*Id.* ¶¶ 91–103.

"Before [he] could finish speaking," the deputies grabbed him by the neck, arms, and legs, pushed him to the back of the cell, and "without warning, . . . body-slammed him onto the floor of the cell on his injured back." *Id.* ¶¶ 104, 106–11.  He did not resist or fight back.  *Id.* ¶ 110. Green pinned him to the ground with a knee in his throat, Holt grabbed him by the neck, Hedgpeth and Graziose grabbed his legs, Benson grabbed his right arm, and Gavrilas applied weight to his upper body.  *Id.* ¶¶ 112–17, 130.  The deputies put his legs in a figure-four hold and demanded that he roll over to his stomach while Hulet repeatedly pleaded for them to stop.  *See id.* ¶¶ 128, 131–38.

Three of the deputies grabbed his injured arm and wrenched it behind his back to roll him over.  *Id.* ¶¶ 140–146.  Hulet yelled at them to stop and to let go of his hand.  *Id.* ¶ 141.  Once he was on his side, Holt began to pull Hulet's shirt off, causing his pleas to become muffled.  *Id.* ¶¶ 141–42.  Holt then removed Hulet's shirt with scissors, revealing a large scar from his back surgeries, along with a tattoo with an arrow calling attention to the scar.  *Id.* ¶¶ 152–53.  Green had his right hand pressed into Hulet's back nearly the entire time.  *See id.* ¶ 154.

After the shirt was removed, Green pinned Hulet's head to the ground with his forearm and twisted the injured arm.  *Id.* ¶ 157.  Gavrilas also grabbed and twisted the injured arm, causing Hulet to cry out.  *See id.* ¶¶ 158–59.  At this point, Graziose ordered Green and Gavrilas to let go, but they ignored her.  *Id.* ¶¶ 160–65.  Benson, Hedgpeth, and Graziose stripped Hulet's pants and underwear from him.  *Id.* ¶ 166.  The deputies then got off Hulet, who was now completely naked and remained lying face down.  *See id.* ¶¶ 167–69.  Holt threw the safety smock on top of Hulet's body.  *See id.*  After leaving the cell, Benson stated, "I'll charge him with 148,

4

also." *Id.* ¶ 170.

The force used by the deputies caused Hulet "severe injury, including aggravating his pre-existing injuries to his recently injured arm and back and injuring his spine at the T11 and T12 vertebrae." *Id.* ¶ 171.  He did not "receive necessary medical care for his injuries at the jail." *Id.* ¶ 173.  He "continues to experience pain and will require further medical care and treatment resulting from the injuries he sustained at the jail, including loss of employment and income." *Id.* ¶ 179.

In his complaint, Hulet asserts:

> [Defendants'] demand that [he] remove his clothing was inconsistent with the [Tuolumne County Sheriff's Office's] policies and procedures, including Policy 516 (Safety and Sobering Cells), which provides: 'Incarcerated persons should be permitted to remain normally clothed or should be provided a safety suit, except in cases where the incarcerated person has demonstrated that clothing articles may pose a risk to the incarcerated person's safety or the facility. In these cases, the reasons for not providing clothing shall be documented on the safety cell log.' Policy 516.3(d) (Safety Cell Procedures). No reason why [Hulet] was not permitted to remain normally clothed or how he demonstrated that clothing articles may pose a risk to his safety or the facility was documented on the safety cell log.

*Id.* ¶ 105.

Following the incident in the jail, Graziose filed a report of the incident that, Hulet contends, falsely misstated the facts.  *Id.* ¶ 174.  He further contends that the report is contradicted by video recordings.  *Id.* ¶ 175.  The report served as the basis for the Tuolumne County District Attorney's Office decision initially to charge him with resisting arrest.  *Id.* ¶ 174.  That charge was later dismissed.  *Id.* ¶ 176.

Plaintiff asserts ten claims in his FAC: (1) excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) retaliation in violation of the First Amendment and 42 U.S.C. § 1983; (3) malicious prosecution in violation of the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983; (4) violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*; (5) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; (6) excessive force in violation of article 1, § 13 of the California Constitution; (7) claims of excessive force, retaliation, malicious prosecution, violation of the ADA and Rehabilitation Act

5

asserted under the Tom Bane Civil Rights Act, California Civil Code § 52.1 ("Bane Act");

(8) assault and battery; (9) intentional infliction of emotional distress; and (10) negligence.  *Id.*

¶¶ 186–247.  Plaintiff seeks compensatory, general, special, and nominal damages "under federal

and state law . . . in excess of $1,000,000, according to proof at trial"; exemplary/punitive

damages against the individual defendants; treble damages, punitive damages, and civil penalties

against the individual defendants pursuant to California Civil Code § 52.1; attorney's fees and

costs pursuant to 42 U.S.C § 1988, 29 U.S.C § 794, California Civil Code § 52.1, and California

Code of Civil Procedure § 1021.5; and interest.  *Id.* at 31–32.

Defendants have moved to dismiss the first, fourth, fifth, sixth, and seventh claims, as well

as all claims as to the Tuolumne County Sheriff's Office.  Mot. to Dismiss at 7–15.  Defendants

Tuolumne County and the Tuolumne County Sheriff's Office have also moved to strike the

request for treble damages and the request for civil penalties.  *Id.* at 16.

## II.  Legal Standard

### a.  Motion to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

sufficiency of the complaint.  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir.

1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901

F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to

relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must contain facts that "nudge [the plaintiff's]

claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In determining whether a complaint states a claim on which relief may be granted, the

court accepts as true the allegations in the complaint and construes the allegations in the light

most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  However,

the court need not assume the truth of legal conclusions cast in the form of factual allegations.

*Iqbal*, 556 U.S. at 680.  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also id.* at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

If a court dismisses a complaint for failure to state a claim, it should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  The "underlying purpose of Rule 15 [is] to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up).  However, a court has discretion to deny leave to amend due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 532 (9th Cir. 2008).

**b. Motion to Strike**

Under Rule 12(f) of the Federal Rules of Civil Procedure, the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010); *Fogerty v. Fantasy, Inc.*, 510 U.S. 5 (1994).

///

///

///

///

7

1      **III.**      **Discussion and Analysis**

2            **a.  Motion to Dismiss**

3                  **i.      Claims Against the Tuolumne County Sheriff's Office**

4      Defendants move to dismiss all claims asserted against the Tuolumne County Sheriff's

5      Office.  Their sole argument is that the Sheriff's Office is not a legal entity under California law

6      that may be sued.  Mot. to Dismiss at 8.  This argument fails.

7            California Government Code § 945 provides that a "public entity may sue and be sued."

8      The Ninth Circuit has held that both a California municipal police department, *Karim-Panahi v.*

9      *Los Angeles Police Dep't*, 839 F.2d 621, 624 n.2 (9th Cir. 1988), and a California county sheriff's

10     department, *Streit v. County of Los Angeles*, 236 F.3d 552, 565–66 (9th Cir. 2001), were "public

11     entities" under California Government Code § 811.2 which may be sued.  It recently reaffirmed

12     both holdings in *Duarte v. City of Stockton*, 60 F.4th 566, 573–74 (9th Cir. 2023).

13           Defendants argue that, since the Ninth Circuit's decision in *Streit*, California courts have

14     determined that county sheriffs' departments are not suable under state law.  Mot. to Dismiss at 8;

15     Reply at 3–4.  This court is bound by the Ninth Circuit's recent holding in *Duarte*, which

16     reaffirmed *Streit*.  Even if *Duarte* were not binding, however, defendants' argument has no merit.

17     Defendants principally point to *Pierce v. San Mateo County Sheriff's Dept.*, which – in a footnote

18     with no accompanying citation or explanation – stated that a "Sheriff's Department is not a

19     separate governmental entity, but is a department of the County."  232 Cal. App. 4th 995, 1000

20     n.1 (Cal. Ct. App. 2014).  This quotation, which was appended to a sentence explaining the

21     background of the case, is clearly dicta.  *Pierce* does not make a similar statement about whether

22     a sheriff's office is a subunit of the county anywhere else, and it certainly never undertakes an

23     analysis of whether a sheriff's office is a "public entity" under California Government Code

24     § 811.2.

25           Defendants also cite to *Trejo v. County of Los Angeles*, 50 Cal. App. 5th 129 (Cal. Ct.

26     App. 2020).  Although defendants do not refer to any specific statement in *Trejo*, they

27     presumably are referring to the *Trejo* court's statement that the Los Angeles County Sheriff's

28     Department is a "political subunit of the County of Los Angeles."  *Id.* at 135.  The quoted

8

statement was made in the context of explaining the function of Los Angeles County's civil service rules. *See id.* The *Trejo* court's interpretation of local regulations has no bearing on whether a sheriff's office is a "public entity" under § 811.2. Accordingly, the cases cited by defendants do not require dismissal of Hulet's claims against the Tuolumne County Sheriff's Office.

> ii. **Claims under Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act**

Defendants County of Tuolumne and the Tuolumne County Sheriff's Office move to dismiss Hulet's ADA and Rehabilitation Act claims. Hulet raises a failure to accommodate claim under both statutes. FAC ¶¶ 205, 210. These claims can be analyzed "together because they provide identical remedies, procedures, and rights." *Libby v. City of Gridley*, No. 2:21-cv-0017, 2021 WL 5360441, at *2 (E.D. Cal. Nov. 17, 2021); *see also A.G. v. Paradise Valley Unified School Dist.*, 815 F.3d 1195, 1203–04 (9th Cir. 2016) ("[T]he elements of a valid Title II claim do not differ in any material sense from those of a valid section 504 claim and the two may be addressed together.").

To establish a prima facie case of failure to accommodate under § 504 of the Rehabilitation Act or Title II of the ADA, Hulet must establish that he "(1) is an individual with a disability; (2) is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities; (3) was either excluded from participation in or denied the benefits of the public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (4) was excluded, denied benefits, or discriminated against by reason of his or her disability." *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014), *rev'd on other grounds* 576 U.S. 600 (2015); *see also* 1 Americans with Disabilities Act: Practice and Compliance Manual § 1:264 (2024); *A.G.*, 815 F.3d at 1206 ("A plaintiff may establish prohibited discrimination under section 504 and Title II by showing that a public entity denied her a reasonable accommodation. . . . To succeed on such a claim, a plaintiff must show that the defendant failed to make reasonable modifications that would accommodate

the plaintiff's disability without fundamentally altering the nature of the program or activity . . . .").

Importantly for purposes of this analysis, "Title II [of the ADA] applies to arrests." *Sheehan*, 743 F.3d at 1232, *rev'd on other grounds* 576 U.S. at 600.  In the context of an arrest, one can assert a claim for "reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.*  Hulet raises this claim.

Defendants argue that the complaint fails to establish: (1) that Hulet had a disability; (2) that Hulet put the deputies on notice of his disability; and (3) that a reasonable accommodation was available.  Mot. to Dismiss at 9–12.  Each argument is discussed in turn.

### 1.   Disability

Defendants argue that Hulet's back and arm injuries do not qualify as disabilities under the ADA or the Rehabilitation Act.  Mot. to Dismiss at 10–11.

The term "disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities of [an] individual."  42 U.S.C. § 12102(1)(A).  The term "major life activities" is defined to "include, but [is] not limited to . . . performing manual tasks, . . . walking, standing, lifting, bending . . . and working."  42 U.S.C. § 12102(2)(A).

In *Bresaz v. County of Santa Clara*, the district court explained the relevant history of the ADA:

> In 2008, Congress amended the ADA. . . . First, Congress sought "[t]o convey congressional intent that the standard created by the Supreme Court [in *Toyota Motor Mfg., Ky., Inc. v. Williams* ("*Toyota Motor*"), 534 U.S. 184 (2002)] . . . ha[d] created an inappropriately high level of limitation necessary to obtain coverage under the ADA."  29 C.F.R. Part 1630, App. Intro.  Second, Congress sought "[t]o convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."  *Id.*  Third, Congress sought to "reinstat[e] a broad scope of protection under the ADA."  *Id.*
>
> Accordingly, the amended version of 42 U.S.C. § 12102 now provides courts and administrative agencies with certain "[r]ules of

construction regarding the definition of disability." 42 U.S.C. § 12102(4). "The definition of disability . . . shall be construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). Specifically, "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the [ADA Amendments Act]." 42 U.S.C. § 12102(4)(B). Finally, "[a]n impairment that is episodic or in remission [may still be considered] a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). EEOC regulations interpreting these [ADA Amendments Act] provisions further provide that "'[s]ubstantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

136 F. Supp. 3d 1125, 1133–34 (N.D. Cal. 2015).[2]

The allegations in the complaint are sufficient to establish that Hulet's back and arm injuries are both disabilities within the meaning of the ADA. For the arm injury, the complaint states that he "injured his left arm and elbow due to work-related activities," and this "substantially limited his ability to perform major life activities, including performing manual tasks, lifting, bending, and working." FAC ¶ 20. In December 2022 – only weeks before his arrest on January 15, 2023 – Hulet had a nerve transposition surgery on his arm. *Id.* It was still in the process of healing at the time of his arrest. *Id.* ¶ 30. "During the healing of his injured and swollen arm, [he received instructions that included] a five-pound weight-limit, pain medications, and physical therapy." *Id.* ¶ 20. His arm "remained sore and needed to be treated with care." *Id.*

As for the back injury, the complaint states that he "severely injured his back in a snowboarding accident" in December 2010. FAC ¶ 19. "Immediately thereafter, [he] underwent a spine fusion surgery where metal was inserted between the L1 and L3 vertebra in his back." *Id.* Then in 2015, he "underwent a second spine surgery where the metal previously inserted between the L1 and L3 vertebra in his back was removed." *Id.* Ever since, the back injury "substantially limited his ability to perform major life activities, including performing manual tasks, standing, lifting, bending, and working." *Id.* His "injured back remained sore and needed to be treated

---

[2]  Defendants rely heavily on *Toyota Motor* in their motion, *see* Mot. to Dismiss at 10–11, even though it has been superseded by congressional amendment, *see* ADA Amendments Act of 2008, Pub. L. No. 110-325, §§ 2(a)(5)–(7), 2(b)(4)–(5), 122 Stat. 3553 ("The purposes of this Act are . . . to reject the standards enunciated by the Supreme Court in *Toyota Motor* . . . ."). Defendants' arguments based on the standards in *Toyota Motor* are thus misplaced.

with care." *Id.*

Although certain aspects of his allegations are conclusory, Hulet has "identified more than the general nature of the disability," as courts typically require.[3]  *See, e.g.*, *Libby v. City of Gridley*, No. 2:21-cv-00017, 2021 WL 5360441, at *3 (E.D. Cal. Nov. 17, 2021).  Importantly, an impairment need limit only "*one* . . . major life activit[y]" to qualify as a disability, 42 U.S.C. § 12102(1)(A), and an "impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."  42 U.S.C. § 12102(4)(C).  Based on the allegations in the complaint, his arm injury substantially limited at least one major life activity.  The complaint states that he was instructed not to lift more than five pounds.  FAC ¶ 20.  An inability for an adult to lift more than five pounds is a substantial limitation on a major life activity.  The impairment was in effect when Hulet was taken into custody, and he had received the surgery and the five-pound weight-limit instruction only weeks before the arrest.  *See id.*  Similarly, his back injury substantially limited at least one major life activity: his ability to stand.  The complaint states that his injury interfered with his ability to stand, *see id.* ¶19, and provides examples of this in the complaint, *see id.* ¶¶ 81, 83, 88, 121.  Ultimately, Congress's preference for "broad coverage" and a liberal interpretation of the terms "disability" and "substantially limits" tip the scale in Hulet's favor.  *See* 42 U.S.C. § 12102(4)(A)–(B).  Accordingly, the FAC sufficiently alleges that Hulet's back and arm injuries qualify as disabilities.

---

[3]  "[C]ourts have generally required the party to plead the disability with some factual specificity."  *Bresaz*, 136 F.Supp.3d at 1136.  The complaint does not specifically state how Hulet was limited in "working."  *See* FAC ¶ 20.  Other than stating that the arm injury was "due to work-related activities," *id.*, the complaint does not state whether Hulet was employed during the time between the injury and his arrest.  Later in the complaint, he states that the injuries sustained at the jail resulted in "the loss of employment and income," *id.* ¶ 179, but it is not clear whether that means he was employed prior to his arrest or whether he was simply unable to gain employment after the arrest due to the new injuries sustained at the jail.  However, the FAC adequately alleges that Hulet was substantially impaired in his ability to stand and in his ability to lift any weight greater than five pounds, both of which are major life activities.  Hulet need only establish that he was substantially limited in one major life activity, so his failure to explain how he was limited in other major life activities, like "working," does not warrant dismissal of his claim.  *See* 42 U.S.C. §§ 12102(1)(A), 12102(4)(C) (defining disability as an "impairment that substantially limits *one* or more major life activities" (emphasis added)).

1          2.   Notice

2          Defendants next argue that the FAC fails to establish that Hulet put them on notice of his

3   disabilities.  Mot. to Dismiss at 11–12.  This argument fails.

4          "A public entity is on notice that an individual needs an accommodation when it knows

5   that an individual requires one, either because that need is obvious or because the individual

6   requests an accommodation."  *Orr v. Cal. Highway Patrol*, No. 2:14-585, 2015 WL 848553, at

7   *18 (E.D. Cal. Feb. 26, 2015) (quoting *Robertson v. Las Animas County Sheriff's Dep't,* 500 F.3d

8   1185, 1198 (10th Cir. 2007)); *see also Johnson v. Shasta County*, 83 F. Supp. 3d 918, 929–30

9   (E.D. Cal. 2015) (notice established because plaintiff "told [the deputies] that he could not move

10  his arm behind his back because of a very recent breast-cancer surgery"); *Libby v. City of Gridley*,

11  No. 2:21-cv-00017, 2021 WL 5360441, at *8–9 (E.D. Cal. Nov. 17, 2021) (notice established

12  because plaintiff "informed [the officer] that he had a physical disability caused by a previous

13  shoulder surgery to his left arm which required the site of the injury to be treated with care").

14         The complaint establishes that Hulet told each of the deputies he encountered that he was

15  injured and that the deputies clearly knew he was injured.  *See* FAC ¶¶ 24, 30, 32, 59–63, 88, 98,

16  100, 121, 127, 139, 141, 147, 153, 158–165.  Hulet asked the deputies who arrested him to bring

17  his pain medication to the jail, and defendant Benson agreed.  *Id.* ¶ 24.  During the booking

18  process, Hulet "informed the deputies that he had previously injured his back and, approximately

19  a month prior, had surgery on his left arm which was currently in the process of healing."  *Id.* ¶

20  30.  He then, with the assistance of a nurse, "completed an 'Intake Medical Screening' form in the

21  presence of officers" and listed each injury and the fact that he had surgery.  *Id.* ¶¶ 31–32.  When

22  defendant Green grabbed Hulet's injured arm to lead him to the safety cell, Hulet told the

23  deputies his arm was in pain and defendants Graziose and Benson registered their awareness of

24  Hulet's arm injury.  *Id.* ¶¶ 59–63.  Moments before Green body-slammed him, defendant Holt

25  said, "I know you have injuries."  *Id.* ¶ 100.  Then, as all the deputies participated in holding him

26  down and removing his clothes, Hulet – as well as defendants Holt and Graziose – told the

27  deputies to be careful with the injured arm and Hulet cried out (seemingly in pain) several times.

28

1    *See id.* ¶¶ 127, 137–139, 141–42, 159–65.  In addition, the large scar from his back surgeries was

2    clearly visible, as was a tattoo with an arrow pointing to the scar.  *Id.* ¶ 153.

3        Hulet's legal theory is that the deputies failed to accommodate his injuries when they

4    failed to "refrain[] from unreasonable and excessive uses of force."  *Id.* ¶¶ 205, 210.  On these

5    alleged facts, the "need [for this accommodation was] obvious" and the deputies were on notice.

6    *Orr*, 2015 WL 848553, at *18.

7                            3.   Reasonable Accommodation

8        Finally, defendants argue that Hulet fails to plead facts which demonstrate that "the

9    defendant[s] failed to make reasonable modifications that would accommodate the plaintiff's

10   disability without fundamentally altering the nature of the program," *A.G.*, 815 F.3d at 1206,

11   because he does not plead that any cells with a bench were available.  Mot. to Dismiss at 12.

12   Defendants misconstrue Hulet's claim.  The FAC identifies Hulet's requested accommodation as

13   freedom from unreasonable and excessive force, *see* FAC ¶¶ 205, 210, but defendants mistakenly

14   argue that the requested accommodation was a cell in which he could sit, *see* Mot. to Dismiss at

15   12.  In his opposition, Hulet confirms that his claims "are *not* based on a failure to provide a cell

16   'in which he could sit' but, rather, are based on defendants' 'unreasonable and excessive uses of

17   force' in light of" his disabilities.  Opp'n at 14.  Defendants do not respond to this argument in

18   their reply.  *See generally* Reply.  Defendants fail to show that dismissal is proper on this ground.

19       In sum, dismissal of Hulet's ADA and Rehabilitation Act claims is not warranted.

20               **iii.    42 U.S.C. § 1983 Claim for Excessive Force**

21       Defendants argue that Hulet's § 1983 claim for excessive force should be dismissed

22   because he fails to establish a Fourteenth Amendment violation.  The parties dispute whether

23   Hulet's § 1983 claim for excessive force should be assessed under the Fourth or Fourteenth

24   Amendment.  *See* Mot. to Dismiss at 14–15; Opp'n at 8.

25       The Supreme Court has not decided "whether the Fourth or Fourteenth Amendment

26   provides the proper basis for a claim of excessive force against a pretrial detainee."  *Lombardo v.*

27   *City of St. Louis*, 594 U.S. 464, 466 n.2 (2021).  The Court has decided that (1) the Fourth

28   Amendment protects citizens from excessive force during an arrest, *Graham*, 490 U.S. at 395;

1   (2) "the Due Process Clause protects a pretrial detainee from excessive force that amounts to

2   punishment," *id.* at 395 n.10 (citing *Bell v. Wolfish*, 441 U.S. 520, 535–39 (1979)); and (3) the

3   Eighth Amendment protects convicted prisoners from "the deliberate use of force [that is]

4   excessive and unjustified," *Whitley v. Albers*, 475 U.S. 312, 327 (1986).

5        Defendants assert that only the Due Process Clause protects pretrial detainees from

6   unreasonable force.  Mot. to Dismiss at 14–15.  Defendants rely on the *Graham* Court's statement

7   in a footnote that "the Due Process Clause protects a pretrial detainee from excessive force that

8   amounts to punishment." *Graham*, 490 U.S. at 395 n.10 (citing *Bell*, 441 U.S. at 535–39 (1979)).

9   However, in the same footnote, the Court explains that it has "not resolved the question of

10  whether the Fourth Amendment continues to provide individuals with protection against the

11  deliberate use of excessive force beyond the point at which arrests ends and pretrial detention

12  begins." *Graham*, 490 U.S. at 395 n.10.  The clear import of these two statements, taken

13  together, is that the Supreme Court has decided that the Due Process Clause provides protection

14  to pretrial detainees from excessive force *that amounts to punishment*, and the Fourth

15  Amendment *may also* provide protection to pretrial detainees from excessive force under that

16  Amendment's "objective reasonableness" standard.  *See id.*  However, while the Supreme Court

17  has not resolved the latter issue, the Ninth Circuit has confirmed that the Fourth Amendment

18  applies in this context.

19       The Ninth Circuit has held that "the Fourth Amendment sets the applicable constitutional

20  limitations for considering claims of excessive force during pretrial detention."  *Lolli v. County of

21  Orange*, 351 F.3d 410, 415 (9th Cir. 2003); *see also Pierce v. Multnomah County*, 76 F.3d 1032,

22  1043 (9th Cir. 1996) ("We hold . . . that the Fourth Amendment sets the applicable constitutional

23  limitations on the treatment of an arrestee detained . . . up until the time such arrestee is released .

24  . . .").  Hulet's claim that the deputies used excessive force against him while he was a pretrial

25  detainee must therefore be evaluated under the Fourth Amendment's "objective reasonableness

26  standard." *Lolli*, 351 F.3d at 415.

27       The Fourth Amendment requires the degree of force used by an officer to be "objectively

28  reasonable" under the circumstances.  *Graham*, 490 U.S. at 395.  The "reasonableness" of the

1   force "must be judged from the perspective of a reasonable officer on the scene, rather than with

2   the 20/20 vision of hindsight." *Id.* at 396.  A court should consider the totality of the

3   circumstances, which includes "the severity of the crime at issue, whether the suspect poses an

4   immediate threat to the safety of the officers or others, and whether he is actively resisting." *Id.*

5       Hulet contends that defendants' use of force was "unreasonable and excessive," FAC

6   ¶ 188, and he alleges detailed facts which could lead a reasonable jury to conclude likewise, *see*

7   *id.* ¶¶ 18–20, 22, 104–172.  For example, he alleges that the deputies body-slammed him onto his

8   back, which they knew to be injured, thus further injuring his T11 and T12 vertebrae.  *See id.*

9   ¶¶ 104, 106–11, 171.  Additionally, they wrenched his injured arm behind his back, knowing that

10  just touching it caused him pain.  *See id.* ¶¶ 54–64, 140–46.  The deputies used this force despite

11  the fact that Hulet had been arrested for low-level misdemeanor offenses, *see id.* ¶ 22, presented

12  no threat to the deputies or himself, *see id.* ¶¶ 105, 125, and did not resist or fight back, *see id.*

13  ¶¶ 122–25.  Hulet has properly pleaded a Fourth Amendment excessive force claim, and

14  defendants' motion to dismiss this claim is denied.

15          **iv.     California Constitution article 1, § 13 Claim**

16      Next, defendants move to dismiss Hulet's claim under article 1, § 13 of the California

17  Constitution, asserting that this constitutional provision does not provide a cause of action for

18  monetary damages.  Mot. to Dismiss at 12–13.  Article 1, § 13 reads, in pertinent part, "The right

19  of the people to be secure in their persons, houses, papers, and effects against unreasonable

20  seizures and searches may not be violated."  Cal. Const. art. 1, § 13.

21      The California Supreme Court has not decided whether a cause of action for damages

22  exists under article 1, § 13.  *Estate of Osuna v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1178

23  (E.D. Cal. 2019).  However, in *Katzberg v. Regents of Univ. of Calif.*, the California Supreme

24  Court set out a two-step framework to assess whether a damages action is available to remedy the

25  violation of a provision of the California Constitution.  127 Cal. Rptr. 2d 482, 495 (Cal. 2002).

26  First, a court must look for evidence of the drafters' affirmative intent to authorize damages.  *Id.*

27  Given that "the words of [most constitutional provisions] do not on their own manifest any such

28  intent," a court must also assess the historical context of the provision, including any "pertinent

16

1    common law history . . . [which has] been endorsed and accepted by the . . . drafters of the state

2    constitution." *Id.* at 495–96, 499.  If neither the text nor history provide evidence of such an

3    affirmative intent, then a court must examine the considerations outlined in *Bivens v. Six*

4    *Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  *Id.* at 495.  The

5    *Bivens* considerations are (1) whether there are "special factors counseling hesitation" to

6    recognize such a right; (2) whether there is an "equally effective alternative remedy"; and (3)

7    whether there is an "explicit congressional declaration that persons injured by [an] officer's

8    violation of the [constitutional provision] may not recover money damages from the agents." *Id.*

9    (quoting *Bivens*, 403 U.S. at 396–97).

10         When there is no California Supreme Court decision on point, a federal court "must

11   predict how [that court] would decide the issue."  *Astaire v. Best Film & Video Corp.*, 116 F.3d

12   1297, 1300 (9th Cir. 1997).  Federal district courts in California have employed the *Katzberg*

13   framework and reached differing conclusions about whether article 1, § 13 provides for damages.

14   *Compare Wigfall v. City and County of San Francisco*, No. C 06-4968, 2007 WL174434, at *4–6

15   (N.D. Cal. Jan. 22, 2007) (finding no damages remedy for a violation of article 1, § 13) and

16   *Buzayan v. City of Davis Police Dep't*, No. 2:06-cv-01576, 2007 WL 2288334, at *8–9 (E.D. Cal.

17   Aug. 8, 2007) (same) *with OSJ PEP Tennessee LLC v. Harris*, No. 14-03741, 2014 WL 4988070,

18   at *6–7 (N.D. Cal. Oct. 7, 2014) (examining common law history and finding a damages remedy

19   under article 1, § 13) and *Millender v. County of Los Angeles*, No. CV 05-2298, 2007 WL

20   7589200, at *39–40 (C.D. Cal. Mar. 15, 2007) (drawing on *Katzberg*'s analysis and concluding

21   there is a damages remedy under article 1, § 13).

22         The district courts that have found a damages remedy for violations of article 1, § 13 have

23   done so by following the reasoning in *Katzberg* that, because many state constitutional rights

24   were based on the rights and remedies found in English common law – and English common law

25   provided a tort remedy for unlawful searches and seizures – state constitutions which forbid

26   unlawful searches and seizures demonstrate an intent to provide a tort remedy, too.  *See, e.g.*, *OSJ*

27   *PEP*, No. 14-03741, 2014 WL 4988070, at *6–7 (citing *Katzberg*, 127 Cal. Rptr. 2d at 500–01).

28

1    Specifically, the *Katzberg* court explained:

2           In considering evidence of an implied right to seek damages, we also
            believe it appropriate to examine, as have sister state jurisdictions
3           that have permitted damage suits to remedy search and seizure
            violations, common law history from which we might infer, within
4           the provision at issue, an intent to provide an action for damages to
            remedy a violation of that provision....
5
            [In a New York case which found a damages remedy under the New
6           York Constitution's unlawful search and seizure provision,] the
            New York Court of Appeals observed that 'the courts have looked
7           to the common-law antecedents of the constitutional provision to
            discover whether a damage remedy may be implied. New York's
8           first Constitution in 1777 recognized and adopted the existing
            common law of England and each succeeding Constitution has
9           continued that practice....'

10          [The New York Court of Appeals] observed, "[t]he prohibition
            against unlawful searches and seizures originated in the Magna
11          Carta and has been part of our statutory law since 1828. The civil
            cause of action was fully developed in England and provided a
12          damage remedy for the victims of unlawful searches at common
            law." Second, the court . . . observed that this English common law
13          rule had been endorsed and accepted . . . by the drafters of the most
            recent [New York] constitution and hence found historical support
14          for an implied remedy in damages.

15   *Id.* at 500 (quoting *Brown v. State*, 89 N.Y.2d 172, 188–89 (N.Y. 2002)).[4]

16          Like the New York Constitution, the California Constitution was adopted with the

17   understanding that English common law remedies were incorporated therein. In 1850, the year

18   following the adoption of California's first constitution, the legislature affirmed that "[t]he

19   Common Law of England, so far as it is not repugnant to or inconsistent with the Constitution of

20   the United States, or the Constitution or laws of the State of California, shall be the rule of

21   decision in all the Courts of this State." Cal. Stats. 1850, ch. 95. Today, this same statute is

22   codified at California Civil Code § 22.2. It is likely that the drafters of article 1, § 13 understood

23   that it provided for a damages action against those who violated its provisions, as English

24   common law did. *See OSJ PEP*, No. 14-03741, 2014 WL 4988070, at *6–7 (reaching same

25

26   ───────────────
     [4] The *Katzberg* court analogized to other state supreme court decisions to point out that article 1,
27   § 7 of the California Constitution – which is not at issue here – did not have the same historical
     liberty interests as constitutional provisions which forbid unlawful search and seizure. *See*
28   *Katzberg*, 127 Cal. Rptr. 2d at 500–01.

                                              18

conclusion).

Additionally, although dicta, the *Katzberg* court hinted that article 1, § 13 was a provision for which a historical damages remedy could be implied.  The court analogized to the New York Court of Appeals' decision in *Brown v. State* to point out that article 1, § 7 of the California Constitution, which guarantees due process, did not have the same historical liberty interests as the provision in New York's Constitution which guards against unlawful search and seizure.  *See Katzberg*, 127 Cal.Rptr.2d at 500–01.  Given that the *Katzberg* court drew favorably on *Brown*'s analysis of the historical liberty interests embodied in the New York Constitution's search and seizure provision, it implies the California Supreme Court's understanding that the similar provision at article 1, § 13 of the California Constitution contains those same historical liberty interests and thus provides a damages remedy.  *See Millender*, No. CV 05-2298, 2007 WL 7589200, at *39–40 (reaching same conclusion).

Defendants do not address this common law history in their briefing, instead pointing only to the text of article 1, § 13.  Mot. to Dismiss at 12–13.  Their bare argument based solely on the text of article 1, § 13 is not persuasive, as the California Supreme Court in *Katzberg* endorsed looking to more than just the text to discern the availability of a damages action.  *See Katzberg*, 127 Cal.Rptr.2d at 496.  "Defendants bear the burden [of showing that dismissal of plaintiff's article 1, § 13 claim is warranted], and here, they have failed to carry it."  *Estate of Osuna*, 392 F.Supp.3d at 1179; *see also Reese-Bey v. Ochoa*, 2021 WL 7184971 (C.D. Cal. Dec. 29, 2021) ("[Defendants] do not address Article 1, § 13's . . . common law history . . . [and therefore] have not persuaded the court that a private damages remedy is unavailable . . . .").  Defendant's motion to dismiss is therefore denied as to plaintiff's article 1, § 13 claim.

### v.    Bane Act Claims

#### 1.   Excessive Force

The Bane Act provides a cause of action when "[a] person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights

19

secured by the Constitution or laws of [California]."  Cal. Civ. Code § 52.1(b).  To sufficiently plead a violation of the Bane Act, "a plaintiff must show (1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion."  *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (2015) (citations omitted).  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law."  *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 792 (2017) (internal quotations omitted).

Defendants assert that, to adequately state a claim under the Bane Act, Hulet must allege threats, intimidation, or coercion separate from the alleged constitutional violation, and that Hulet's Bane Act claim for excessive force must be dismissed because the FAC fails to do so.  *See* Mot. to Dismiss at 13–14.  More particularly, defendants assert that there need to "have been threats, coercion or violence which was separate from the violation used to perpetrate the violation.  Here, however, the alleged threats and violence are the alleged violation."  *Id.*  Hulet argues that, under *Cornell*, the FAC need not allege threats, intimidation, or coercion separate from the alleged constitutional violation.  Opp'n at 20–21.

Contrary to defendants' argument, under the Bane Act the offending threat, intimidation, or coercion need not be transactionally independent from an alleged constitutional violation.  *See Cornell*, 17 Cal. App. 5th at 799-800, 802 n.31 (where an unlawful arrest, which is inherently coercive, is properly pleaded, plaintiff need not allege a further coercive, intimidating, or threatening act).  In *Cornell*, the California Court of Appeal acknowledged the case law reflected confusion regarding the pleading requirements of the Bane Act and noted that the decision in *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947 (2012), had been mistakenly cited for the proposition that the Bane Act always "requires a showing of coercion independent from the coercion inherent" in the constitutional violation.  *Cornell*, 17 Cal. App. 5th at 795-801.

In such cases involving an alleged constitutional violation, the plaintiff instead must prove, in addition to the constitutional violation, that the defendant acted with "a specific intent to

violate the . . . right." *See id.* at 801.  The "specific intent standard" is met when (1) "the right at

issue [is] clearly delineated and plainly applicable under the circumstances of the case"; and (2)

"the defendant commit[ed] the act in question with the particular purpose of depriving the citizen

victim of his enjoyment of the interests protected by that … right." *Id.* at 803.  "Reckless

disregard of the 'right at issue' is all that [is] necessary" to prove the second prong.  *Id.* at 804.

Therefore, "if a plaintiff adequately pleads a claim for deliberate indifference, which requires a

pleading of reckless disregard, then he has sufficiently alleged the intent required for the Bane

Act claim." *Luttrell v. Hart*, No. 5:19-cv-07300-EJD, 2020 WL 5642613, at *5 (N.D. Cal. Sept.

22, 2020) (citation omitted); *see also Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir.

2018) ("As we have explained in applying the *Screws* specific intent standard to an excessive

force violation of 18 U.S.C. § 242, . . . it is not necessary for the defendants to have been thinking

in constitutional or legal terms at the time of the incidents, because a reckless disregard for a

person's constitutional rights is evidence of a specific intent to deprive that person of those

rights." (internal quotation and citations omitted)).

   "[T]he federal court must follow [a relevant] state intermediate appellate court decision

unless the federal court finds convincing evidence that the state's supreme court likely would not

follow it." *Reese*, 888 F.3d at 1042 (citing *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994

(9th Cir. 2007)).  In *Reese*, the Ninth Circuit determined there was "no 'convincing evidence that

the state's supreme court likely would not follow' *Cornell*" in its analysis of the Bane Act.  *Id.* at

1043.  This court will follow *Cornell*'s reasoning, consistent with Ninth Circuit precedent.

   As these authorities demonstrate, Hulet need not allege a separate threatening, coercive, or

intimidating action to properly plead his Bane Act excessive force claim.  Rather, he must meet

the specific intent test and show that (1) "the right at issue [is] clearly delineated and plainly

applicable under the circumstances of the case" and (2) "the defendant commit[ed] the act in

question with the particular purpose of depriving the citizen victim of his enjoyment of the

interests protected by that … right," which can be shown by pleading reckless disregard of the

right.  *Cornell*, 17 Cal. App. 5th at 803, 804; *id.*

   Here, the right at issue—the right to be free from excessive force under the Fourth

1    Amendment to the United States Constitution—is clearly delineated and plainly applicable, as

2    discussed previously.  *See supra* Part III.A.iii.  Second, Hulet pleads that the deputies violated his

3    rights with "deliberate indifference or reckless disregard," FAC ¶ 221, and states many facts to

4    support that claim, see *id.* ¶¶ 103–72.  For example, he alleges that the deputies body-slammed

5    him onto his back, which they knew to be injured, thus further injuring his T11 and T12

6    vertebrae.  *See id.* ¶¶ 104, 106–11, 171.  Additionally, they wrenched his injured arm behind his

7    back, knowing that just touching it caused him pain.  *See id.* ¶¶ 54–64, 140–46.  The deputies

8    used this force even though Hulet had been arrested for low-level misdemeanor offenses, *see id.*

9    ¶ 22, presented no threat to the deputies or himself, *see id.* ¶¶ 105, 125, and did not resist or fight

10   back, *see id.* ¶¶ 122–25.  Therefore, Hulet has properly pleaded a Bane Act violation based on

11   excessive force under the Fourth Amendment.

12                            2.   Malicious Prosecution

13           Defendants also move to dismiss Hulet's Bane Act claim for malicious prosecution in

14   violation of the Fourth Amendment.  Mot. to Dismiss at 14.  The Supreme Court has recognized a

15   Fourth Amendment claim for malicious prosecution, and the elements of malicious prosecution

16   under the Fourth Amendment are defined by looking initially to tort law.  *See Thompson v. Clark*,

17   596 U.S. 36, 42 (2022); *see also Manuel v. City of Joliet*, 580 U.S. 357, 370 (2017) ("In defining

18   the contours and prerequisites of a [Fourth Amendment] § 1983 claim . . . courts are to look first

19   to the common law of torts . . . [which is] meant to guide rather than to control the definition of"

20   the constitutional claim.).  Under California tort law, malicious prosecution requires a showing

21   "that the prior proceeding, commenced by or at the direction of the malicious prosecution

22   defendant, was: (1) pursued to a legal termination favorable to the plaintiff; (2) brought without

23   probable cause; and (3) initiated with malice."  *Villa v. Cole*, 4 Cal. App. 4th 1327, 1334 (1992).

24           Defendants argue that Hulet fails to establish the first element, favorable termination.

25   Mot. to Dismiss at 14.  Defendants argue that, under California law, favorable termination is

26   shown only when there is "a termination reflecting the merits of the action and plaintiff's

27   innocence of the misconduct."  *Pattiz v. Minye*, 61 Cal.App.4th 822, 827 (1998).  Under

28   California tort law (as well as the tort law of many other states, *see* Restatement (Second) of Torts

§ 660 & cmt. a (1976)), some affirmative indication of innocence is necessary.  *See Sagonowsky v. More*, 64 Cal. App. 4th 122, 128 (1998) ("[T]he termination must relate to the merits of the action by reflecting either on the innocence of [the plaintiff] or [his] lack of responsibility for the misconduct alleged against him.").

Under the Fourth Amendment, however, that is not true.  In *Thompson*, the Supreme Court rejected the argument that modern tort law should inform the contours of a Fourth Amendment malicious prosecution claim.  *Id.* at 47–48.  The Court acknowledged that the Restatement (Second) of Torts (1976) endorsed the idea that the favorable termination element requires some affirmative showing of innocence, as have many jurisdictions today.  *Id.*  But the Court explained that the "relevant inquiry" to understand the meaning of a malicious prosecution claim under the Fourth Amendment is tort law in early American history, not current tort law.  *Id.* at 48.

"To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim . . . for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction."  *Thompson*, 596 U.S. at 39.  In *Thompson*, the Court recognized a consensus among early American courts that all a plaintiff need show to establish favorable termination was a conclusive end to the prosecution without a conviction.  *Id.* at 44–47.  Those courts' understanding of what was needed to establish favorable termination also settles what must be shown to establish favorable termination under the Fourth Amendment today.  *Id.* at 48.

Defendants' arguments fail to adequately consider that Hulet's Bane Act claim for malicious prosecution is based on an alleged violation of the Fourth Amendment.  Consistent with *Thompson*, Hulet is required to plead only that his prosecution ended without a conviction.  *Id.* at 39.  Hulet does so.  The FAC states that the "Tuolumne County District Attorney's Office dismissed the charge of resisting arrest . . . previously filed against" him.  FAC ¶ 176.  As the FAC sufficiently alleges that the prosecution was favorably terminated without a conviction, dismissal of this claim is denied.

23

1

   **b.   Motion to Strike**

2       Defendants Tuolumne County and the Tuolumne County Sheriff's Office move to strike

3   Hulet's request for treble damages.  Mot. to Dismiss at 16.  Under California Government Code

4   § 818, a court may not impose damages "primarily for the sake of example and by way of

5   punishing" a public entity, such as the County or Sheriff's Office.  Defendants assert that the

6   treble damages authorized by California Civil Code § 52(a) are punitive or exemplary in nature

7   and are therefore barred by Government Code § 818.  *Id.*

8       "[W]hether treble damages are punitive or compensatory is not so clear-cut."  *Archibald v.*

9   *County of San Bernardino*, No. ED CV 16-01128-AB, 2018 WL 8949779, at *1 (C.D. Cal. May

10  10, 2018).  "[D]ifferent statutory treble-damages provisions [belong] on different points [of] the

11  spectrum between purely compensatory and strictly punitive awards."  *PacifiCare Health Systems*

12  *v. Book*, 538 U.S. 401, 405 (2003).  Section 52(a) "does not itself characterize the damages it

13  authorizes as punitive" or compensatory.  *Archibald*, 2018 WL 8949779, at *1.  No California

14  court has decided whether the treble damages supplied by § 52(a) are compensatory or punitive

15  either, although the California Supreme Court has stated, in dicta, that § 52(a) "reveals a desire to

16  punish intentional and morally offensive conduct."  *Harris v. Capital Growth Investors XIV*, 278

17  Cal. Rptr. 614, 632 (Cal. 1991).

18      Federal district courts considering the issue have taken different approaches.  Some have

19  followed the California Supreme Court's dicta in *Harris* and held that § 52(a) treble damages are

20  punitive, *see, e.g.*, *Jefferson v. City of Fremont*, No. C-12-0926, 2012 WL 1534913, at *7 (N.D.

21  Cal. Apr. 30, 2012), while others have undertaken a more context-specific analysis, discerning

22  whether the imposition of treble damages could serve a non-punitive purpose in that particular

23  case, *see, e.g.*, *Archibald v. County of San Bernardino*, No. ED CV 16-01128-AB, 2018 WL

24  8949779 (C.D. Cal. May 10, 2018).  Considering that treble damages exist "along [a] spectrum"

25  and "the immunity afforded to public entities under § 818 is narrow, *extending only to damages*

26  *whose purpose is simply and solely punitive or exemplary*," *Los Angeles Cty. Metro v. Superior*

27  *Court*, 123 Cal. App. 4th 261, 275 (Cal. Ct. App. 2004) (emphasis in original), the court finds the

28  latter approach more persuasive.  Moreover, Hulet explicitly disclaims a desire to seek punitive

1   damages against defendants County of Tuolumne or the Tuolumne County Sheriff's Office.  *See*

2   FAC, Prayer for Relief, ¶ 3.

3        In *Archibald*, the court noted two potential non-punitive purposes for § 52(a)'s treble

4   damages provision: "first, compensation, that is, to ensure a plaintiff is fully compensated; and

5   second, to encourage persons with low-value Bane Act claims to pursue them."  2018 WL

6   8949779, at *2.  Section 52(a) sets the amount to be trebled at a *minimum* of $4,000, *see* Cal. Civ.

7   Code § 52(a), which appears intended as an incentive for plaintiffs to pursue lower dollar-value

8   Bane Act claims or claims less readily quantifiable in terms of monetary loss.[5]  In the case at

9   hand, Hulet alleges several Bane Act claims for which compensation might be difficult to

10  determine, such as his Fourth Amendment malicious prosecution claim and his First Amendment

11  retaliation claim.[6]

12       In *Archibald*, the jury awarded the plaintiff $7 million in actual damages after trial.  2018

13  WL 8949779, at *2.  The court explained, when rendering judgment, that § 52(a) treble damages

14  against the county would not serve either potential non-punitive purpose that it had previously

15  identified.  *Id.*  Considering the size of the actual damages award, it would not serve a

16  compensatory purpose because the plaintiff had been fully compensated.  *Id.*  And treble damages

17  were not needed as an incentive mechanism, either, because the case was not one that the plaintiff

18  "needed financial encouragement to pursue."  *Id.*

19       In the present case, striking the request for treble damages against the County and

20  Sheriff's Office now would be premature.  The court is unable to determine, at this juncture,

21  
22  [5]  The $4,000 minimum, coupled with the private cause of action, resembles statutory damage
    provisions found in consumer protection statutes – provisions which legislators often include to
    "create a . . . market for [their] enforcement."  Tyler K. Somes, *Assessing* Spokeo, Inc. v. Robins*:*
23  *The Future of Statutory Damage Class Actions in the Consumer Protection Arena*, 16 J.
    Consumer & Commercial L. 122, 126 (2017).
24  
25  [6]  The difficulty of translating certain harms inflicted by constitutional violations into a monetary
    damages amount has been noted.  *See, e.g.*, *Presumed Damages for Fourth Amendment*
26  *Violations*, 129 U. Pa. L. Rev. 192, 196–200 (1980).  "Many constitutionally protected rights are
    intangible in nature: as highly as society values them, one cannot hope to 'prove' their value as
27  one would prove the economic value of a tortiously destroyed eye, breadwinner, or prize cow."
    *Id.*
28

whether Hulet will be fully compensated if he prevails on his claims, nor is it able to determine if this is the type of case that plaintiffs need "financial encouragement to pursue." *Id.*  Accordingly, the court declines to strike the request for treble damages.  If it later appears that the imposition of § 52(a) treble damages would serve only a punitive purpose, the court may reconsider the issue at that time.

**IV.**     **Conclusion and Order**

Based upon the foregoing, defendants' motion to dismiss and motion to strike, Doc. 35, is **DENIED**.

IT IS SO ORDERED.

Dated:   August 10, 2024

_____
UNITED STATES DISTRICT JUDGE

26