1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10
11

GRANT HULET,

No.  1:23-cv-01217-KES-HBK

12

Plaintiff,

13

v.

ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING QUALIFIED IMMUNITY

14

COUNTY OF TUOLUMNE, TUOLUMNE COUNTY SHERIFF'S OFFICE, BILL POOLEY, CARL BENSON, MARCUS GREEN, SHAYLENE GRAZIOSE, JESSICA HOLT, SHELBY HEDGPETH, and DANIEL GAVRILAS,

15
16
17

(Doc. 37)

18

Defendants.

19
20
21

Plaintiff Grant Hulet brings this action against defendants County of Tuolumne, Tuolumne

22

County Sheriff's Office, Sheriff Bill Pooley, and officers Carl Benson, Marcus Green, Shaylene

23

Graziose, Jessica Holt, Shelby Hedgpeth, and Daniel Gavrilas.  Doc. 29 ("FAC").  Hulet alleges

24

that the officers used excessive force while he was in pretrial detention and injured him.  *Id.*

25

Although Hulet alleges all individual defendants violated his Fourth Amendment right to be free

26

from excessive force, Hulet moves for summary judgment only as to conduct by officer Marcus

27

Green.  Doc. 37 ("MSJ").  In his opposition, Green argues, among other things, that he is entitled

28

to qualified immunity.  Doc. 43 ("Opp'n").  For the reasons set forth below, Hulet's motion for

1

1    summary judgment is denied as there are genuine disputes of material fact.  The Court also

2    concludes that such disputes of material fact preclude finding qualified immunity for Green.

3    **I.**    **Background**[1]

4        In December 2022, the month before the incident giving rise to this action, plaintiff Grant

5    Hulet underwent a nerve transposition surgery on his left arm and elbow for an injury he

6    sustained while working earlier that year.  Doc. 43-1 ("UF") ¶¶ 7–8; Doc. 37-3, Ex. G ("Med.

7    Recs.").  Hulet was instructed to take pain medication, get physical therapy, and refrain from

8    lifting more than five pounds.  Med Recs.  In addition to the arm injury, Hulet suffered from the

9    long-term effects of a back injury that occurred twelve years earlier and required two spine

10   surgeries.  UF ¶ 8; Med. Recs. at 25–26; Doc. 37-3, Ex. E ("Med. Intake Scr. Form").  Both his

11   arm and back remained injured on the date of the event giving rise to this action.  *See* UF ¶¶ 7–

12   11*;* Med. Recs.; Med. Intake Scr. Form.

13       On January 15, 2023, Hulet was arrested at his home in Sonora, California, by two

14   Tuolumne County police officers for failing to appear at a court hearing involving two

15   misdemeanor vehicle infractions.  UF ¶ 1.  The officers placed Hulet in handcuffs.  Doc. 37-3,

16   Ex. A ("Benson Body Cam Footage") at 00:22:03.  As they did so, Hulet requested that he be

17   allowed to bring his pain medication to the jail, which the officers allowed.  Doc. 37-3, Ex. A

18   ("Benson Body Cam Footage") at 00:22:03.  Hulet cooperated with police as they arrested him,

19   *see id.* at 00:22:22, but became increasingly frustrated as the police placed him into the back of

20   the police car, *see id.* at 00:24:44–00:34:00.  Hulet screamed at the officers, though he did not

21   threaten the officers or say that he was suicidal.  *See id.*  During this process, Hulet's father

22   informed the officers that Hulet had mental health issues which needed treatment.  *Id.* at

23   00:26:45–00:27:04.[2]

24

25   [1]  The following facts are undisputed, except where noted otherwise.  As Hulet's motion concerns solely Green's conduct, the facts below focus on that conduct.

26
27   [2]  The parties dispute whether Green knew about Hulet's father's remarks about his son's mental health and Hulet's "violative behavior."  Doc. 43-2 ("DUF") ¶¶ 14–15; *see* Reply at 6.  Green asserts that "Corporal Benson informed the jail staff upon arriving with Hulet that Hulet had

28   demonstrated violative behavior . . . [and] appeared suicidal based on Benson's observation."  *Id.*

2

1    Officer Benson drove Hulet to the detention center for booking.  UF ¶¶ 2–3; *id.* at

2    00:25:00–01:12:15.  During the arrest and booking process, Hulet informed the officers of his

3    pre-existing injuries and the pain stemming from them.  *See* UF ¶¶ 7–11; Med. Intake Scr. Form;

4    Doc. 37-3, Ex. D at 12:00–15:40; Benson Body Cam Footage at 00:22:03, 00:25:28, 01:06:22–

5    01:10:00, 01:11:33–01:11:38; 01:13:12, 01:14:33–01:17:26.  Hulet informed the officers both

6    verbally and on the booking forms, such as the "Intake Medical Screening" form that he filled out

7    in the presence of five of the defendants.  *See* UF ¶¶ 7–11; Med. Intake Scr. Form.  Hulet was

8    initially calm and cooperative at the station – where he first encountered the other defendant

9    officers, including Green.  Benson Body Cam Footage at 00:50:30–00:00:54:30.

10    About fifteen minutes into the booking process, Hulet began to express frustration with

11    the officers and the situation he was in.  *See* UF ¶ 12; Benson Body Cam Footage at 01:10:10–

12    01:11:20.  Hulet stated, "You guys do nothing to help the citizens."  UF ¶ 13; *see* Benson Body

13    Cam Footage at 01:10:10.  Graziose responded, "Okay. So, due to the fact that your statements

14    and then you're – you know – indecisive and you're trying to tell me that you're not suicidal but

15    you're – you've made all indications that you are."  UF ¶ 14; Benson Body Cam Footage at

16    01:10:13–01:11:27.  Hulet replied, "I'm ready to get the hell out of town. Just – just let me go.

17    Let me be. Stop fucking with me."  UF ¶ 15; Benson Body Cam Footage at 01:10:27–01:11:35.

18    After explaining that the officers were required to bring Hulet into the station because of his

19    missed court date and outstanding bench warrant, Graziose asked defendant Jessica Holt, "So,

20    you still want safety?"  UF ¶ 24; Benson Body Cam Footage at 01:11:20.  Holt nodded,

21    apparently confirming that Hulet should be placed in a "safety cell."  *See id.*

22    As Hulet asked what was going on, defendant Marcus Green grabbed Hulet's injured arm

23    and directed him to come along.  UF ¶¶ 29–34.  Hulet – as well as the other officers – informed

24    ────────────────────

25    Hulet argues that Green's assertion is contradicted by Benson's body camera footage, which
appears to show that officer Benson did not make such a remark, or at least not to Green.  Benson

26    Body Cam Footage at 00:54:30–01:10:06.  Benson muted the microphone on his body camera
while he spoke to officer Shaylene Graziose, and it is unclear whether he provided that

27    information to her.  *See id.* at 00:59:50–01:00:45.  There is no evidence that Green, who appears
to have been with Hulet in another room at the time, heard Benson make any such statement.  *See*

28    *id.*

Green that his arm was injured and that grabbing it caused him pain. *Id.* ¶¶ 29–38; Benson Body Cam Footage at 01:11:25–01:11:39. Prior to taking Hulet to the safety cell, the officers instructed him to stand with his back against the wall so they could take his picture, as well as take photos of any identifying features, such as tattoos. UF ¶¶ 39–54; Benson Body Cam Footage at 01:11:39–01:12:14. The officers then directed Hulet to the safety cell. UF ¶¶ 55–56; Benson Body Cam Footage at 01:12:14–01:12:43. Hulet objected that there was nowhere to sit in the cell and that the floor appeared to be wet; the officers did not put him in another room. UF ¶¶ 59–64; Benson Body Cam Footage at 01:12:43–01:13:10. As Hulet entered the cell, he turned to face the officers, who remained just outside the cell door. Safety Cell Footage at 00:33.

The officers directed Hulet to completely remove his clothes and put on a "safety gown" smock. UF ¶¶ 55–56; Benson Body Cam Footage at 01:12:43–01:13:10. Hulet and the officers exchanged the following words:

> Green: Okay. You have to put this on.
>
> Hulet: Why?
>
> Holt: We're concerned for your safety. Now, [I'm] going to need all your clothes from you. We won't steal anything from you. It would be best if you could just take them off, nice and calm, one at a time, and hand them over.
>
> Hulet: No. I'm not doing that.
>
> Holt: Well, we're going to have to take them off for you, if you're not giving them up.
>
> Hulet: No. I'm sorry.
>
> Graziose: Okay. We're just –
>
> Holt: We're not trying to hurt you.
>
> Graziose: It's part of the process.
>
> Holt: I know you have injuries.
>
> Hulet: I'm not losing my dignity.
>
> Graziose: We're not going to come in there –
>
> Hulet: I'm not losing my dignity. Listen –

4

1  UF ¶¶ 66–78; Benson Body Cam Footage at 01:13:26–01:13:45.  This exchange lasted

2  approximately twenty seconds.  *See* Benson Body Cam Footage at 01:13:26–01:13:46.

3  During the exchange, Hulet walked from the back of the cell toward the officers, stopping

4  several feet away from Green, who was the officer closest to Hulet and was standing at the open

5  entrance to the cell.  Safety Cell Footage at 0:55–1:08.  Hulet then approached within arm's

6  length of Green, and Green and another officer motioned for Hulet to step back, but Hulet did not

7  do so.  Safety Cell Footage at 01:24–01:32.  As he stepped within arm's reach of Green, Hulet

8  bent his right arm at the elbow with his thumb pointing toward the ceiling and his fingers of his

9  right hand closed.  Safety Cell Footage at 01:24.

10  Before Hulet could finish speaking, Green and two other officers pushed Hulet to the back

11  of the cell.  *Id.*  With no warning, Green wrapped his arm around Hulet's neck, as if going for a

12  headlock.  Safety Cell Footage at 01:31–01:37.  Green then moved to grab Hulet by the legs,

13  lifted him into the air, and flipped Hulet onto the floor of the cell on his back.[3]  Safety Cell

14  Footage at 01:36–01:39.  Over the course of the next several minutes, the officers restrained Hulet

15  and stripped him naked.  Benson Body Cam Footage at 01:13:51–01:17:25; Safety Cell Footage

16  at 01:37–6:00.  The officers took his clothes and left him with a safety smock.  *Id.*  Green's take-

17  down of Hulet aggravated the chronic back pain associated with Hulet's "previously-injured and

18  surgically-repaired spine."  UF ¶ 91; *see* Med. Recs. at 25–26.

19  Tuolumne County Sheriff's Office Policy 300 (Use of Force) provides that deputies "may

20  only use a level of force that they reasonably believe is proportional to the seriousness of the

21  suspected offense or the reasonably perceived level of actual or threatened resistance."  UF ¶ 96;

22  Doc. 37-3, Ex. I.  It also emphasizes de-escalation techniques.  *Id.*  Green had "training and

23  expertise in defensive tactics, de-escalation techniques, and [worked] as an instructor in teaching

24  the appropriate methods for using force when interacting with violent or potentially violent

25  members of the public."  UF ¶ 98; Doc. 37-3, Ex. H.

26

27  [3]  Green repeatedly disputes the characterization of the take-down maneuver as a "body slam."
*See, e.g.*, Opp'n at 20; UF ¶¶ 86.  The video shows that Green lifted Hulet's legs in the air, above

28  Hulet's back, before his back struck the ground.  Safety Cell Footage at 01:31–01:37.

1    Hulet's complaint asserts ten claims: (1) excessive force in violation of the Fourth

2    Amendment and 42 U.S.C. § 1983; (2) retaliation in violation of the First Amendment and 42

3    U.S.C. § 1983; (3) malicious prosecution in violation of the Fourth and Fourteenth Amendments

4    and 42 U.S.C. § 1983; (4) violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*;

5    (5) violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et

6    seq.*; (6) excessive force in violation of article 1, § 13 of the California Constitution; (7) claims of

7    excessive force, retaliation, malicious prosecution, and violation of the ADA and Rehabilitation

8    Act asserted under the Tom Bane Civil Rights Act ("Bane Act"), California Civil Code § 52.1;

9    (8) assault and battery; (9) intentional infliction of emotional distress; and (10) negligence.  Doc.

10    29 ("FAC") ¶¶ 186–247.

11    On July 25, 2024, Hulet filed a motion for summary judgment on the single ground that

12    Green's conduct constituted excessive force in violation of the Fourth Amendment.  MSJ.  Green

13    argues that his conduct was objectively reasonable under the circumstances and asserts the

14    affirmative defense of qualified immunity.  Opp'n.

15    **II.    Legal Standard**

16    Summary judgment is appropriate if "there is no genuine dispute as to any material fact

17    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

18    "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.

19    Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

20    of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in

21    the record."  Fed. R. Civ. P. 56(c)(1).  The Court then views the record in the light most favorable

22    to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.

23    Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).  The nonmoving party's version

24    of the facts need not be credited if it is blatantly contradicted by video evidence.  *Vos v. City of

25    Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).  The "purpose of summary judgment is to

26    'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

27    trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).

28    "A party seeking summary judgment bears the initial burden of informing the court of the

1   basis for its motion and of identifying those portions of the pleadings and discovery responses

2   that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless,*

3   *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

4   (1986)).  If "the moving party will have the burden of proof on an issue at trial, the movant must

5   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

6   party." *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he

7   moving defendant bears the burden of proof on the issue of qualified immunity.").

8        If the moving party meets its initial burden, the burden shifts to the nonmoving party to

9   produce evidence supporting its claims or defenses and "establish that there is a genuine issue of

10   material fact." *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply

11   show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).

12   "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is

13   insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

14        In the endeavor to establish the existence of a factual dispute, the nonmoving party need

15   not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec.*

16   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual

17   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18   trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

19   253, 289 (1968)).  However, "[w]hen opposing parties tell two different stories, one of which is

20   blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

21   adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*

22   *v. Harris*, 550 U.S. 372, 380.  Nevertheless, "[t]he mere existence of video footage of the incident

23   does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn

24   from that footage." *Vos*, 892 F.3d at 1028 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

25        "If the nonmoving party fails to produce enough evidence to create a genuine issue of

26   material fact, the moving party wins the motion for summary judgment.  But if the nonmoving

27   party produces enough evidence to create a genuine issue of material fact, the nonmoving party

28   defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,

1  1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

2  **III.**    **Discussion and Analysis**

3      To succeed on a § 1983 claim, a plaintiff "must demonstrate that the action (1) occurred

4  under color of state law, and (2) resulted in the deprivation of constitutional or federal statutory

5  right." *Rodriguez v. City of Modesto*, No. 1:10-cv-01370-LJO-MJS, 2015 WL 1565354, at \*14

6  (E.D. Cal. April 8, 2015) (quoting *Leer v. Murphy,* 844 F.2d 628, 632–33 (9th Cir. 1988)).  The

7  parties do not dispute that Green's actions occurred under color of state law, so the Court

8  proceeds directly to the constitutional claim.

9      The analysis proceeds in two parts: First, the Court analyzes Hulet's motion for summary

10 judgment on his Fourth Amendment claim and construes the facts in the light most favorable to

11 Green, the non-moving party.  *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88.  Second, the

12 Court analyzes whether Green is entitled to qualified immunity, construing the facts in the light

13 most favorable to Hulet, the injured party.  *See Rodriguez*, 2015 WL 1565354, at \*23 (E.D. Cal.

14 April 8, 2015) ("It is beyond dispute that for purposes of a qualified immunity analysis, the Court

15 must use the injured party's facts." (citing *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009)).

16 The Court concludes that genuine disputes of material fact preclude summary judgment for Hulet

17 and, additionally, preclude finding Green entitled to qualified immunity.

18     **a.  Hulet's Motion for Partial Summary Judgment**

19     First, the Court must determine if Green's use of force was objectively reasonable,

20 viewing the facts in the light most favorable to Green, to the extent his version of the facts is not

21 "clearly contradict[ed]" by the video evidence.  *See Scott*, 550 U.S. at 378.  "[T]he Fourth

22 Amendment sets the applicable constitutional limitations for considering claims of excessive

23 force during pretrial detention."  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 415 (9th Cir. 2003).  An

24 officer's use of force is "measured by the standard of objective reasonableness."  *Deorle v.*

25 *Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001).  This standard requires courts to decide

26 "whether the totality of the circumstances justified a particular" use of force.  *Nelson v. City of*

27 *Davis*, 685 F.3d 867, 878 (9th Cir. 2012) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

28     "The reasonableness of the force used . . . is determined by 'carefully balancing the nature

8

1    and quality of the intrusion on the individual's Fourth Amendment interests' against the

2    countervailing governmental interests at stake.'"  *Deorle*, 272 F.3d at 1279 (quoting *Graham v.*

3    *Connor*, 490 U.S. 386 (1989)).  A substantial governmental interest justifies a "greater intrusion

4    upon the Fourth Amendment rights of the person," while an insubstantial governmental interest

5    could render "the application of even minimal force" unreasonable.  *Nelson*, 685 F.3d at 878.

6    "When balancing the degree of force used against the governmental interests, 'it is the *need* for

7    force which is at the heart of the analysis.'"  *Id.* (quoting *Headwaters Forest Def. v. Cnty. of*

8    *Humboldt* ("*Humboldt II*"), 276 F.3d 1125, 1130 (9th Cir. 2002)).

9        **1.  Nature and Quality of the Intrusion**

10           To determine the nature and quality of the intrusion, the Court must consider "the type

11   and amount of force inflicted."  *Deorle*, 272 F.3d at 1279 (quoting *Headwaters Forest Def. v.*

12   *Cnty. of Humboldt* ("*Humboldt I*"), 240 F.3d 1185, 1198 (9th Cir. 2000) (vacated and remanded

13   on other grounds sub nom. *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001))).

14   Different types of force "intrude upon the Fourth Amendment rights of the individual to varying

15   degrees," *Nelson*, 685 F.3d at 878, and "[c]haracterizing the amount of non-lethal force can often

16   depend on specific factual circumstances," *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir.

17   2021).  "Physical blows or cuts often constitute a more substantial application of force than

18   categories of force that do not involve an impact to the body."  *Id.* (quotations omitted).  Here, the

19   video clearly depicts the take-down.  *See* Safety Cell Footage at 01:24–01:37; Benson Body Cam

20   Footage at 01:13:21–01:13:57.

21           The Ninth Circuit has repeatedly held that take-down maneuvers may constitute a

22   "substantial" or "significant" amount of force.  *See, e.g.*, *Andrews v. City of Henderson,* 35 F.4th

23   710, 716 (9th Cir. 2022); *Rice*, 989 F.3d at 1121; *see also Blankenhorn v. City of Orange*, 485

24   F.3d 463, 479 (9th Cir. 2007) (finding, without determining the precise amount of force, that

25   officers acted unreasonably in "gang-tackling" a plaintiff); *Santos v. Gates*, 287 F.3d 846, 854–55

26   (9th Cir. 2002) (holding that tackling a kneeling plaintiff with enough force to cause a

27   compression fracture of his L-2 vertebra was "quite severe").  In *Rice*, the Ninth Circuit held that

28   an officer's take-down maneuver in which the arrestee's arms were held behind his back as he

9

1  was tripped so that he would fall face-first to the ground constituted a "substantial and aggressive

2  use of force."  989 F.3d at 1121 (quotations omitted).  Similarly, in *Andrews v. City of*

3  *Henderson*, the Ninth Circuit held that an officer who lunged at an unsuspecting arrestee from

4  one foot behind and tackled him with enough force to fracture his hip applied a substantial

5  amount of force.  35 F.4th at 715–16.

6      Green's take-down amounts to a substantial use of force.  A "foreseeable risk of [further]

7  physical injury" is a relevant consideration to the analysis.  *Bryan v. MacPherson*, 630 F.3d 805,

8  825 (9th Cir. 2010).  Green was aware that Hulet was recovering from prior injuries to his back

9  and left arm, as Hulet had indicated as much on the Medical Intake Screening Form.

10  Additionally, one or more other officers stated in Green's presence, including right before Green

11  took Hulet down, that they were aware Hulet had prior injuries.  Benson Body Cam Footage at

12  01:13:26–01:13:45 (Holt stated, "We're not trying to hurt you. . . . I know you have injuries.").

13  Given Hulet's prior back injuries, a reasonable officer would have known that a take-down

14  maneuver that rapidly flipped Hulet down on his back onto the concrete floor could likely result

15  in significant injury.  Nevertheless, with no prior warning, Green swept Hulet's legs from under

16  him, lifted him into the air, and flipped him onto his injured back.

17      Green disputes the extent of Hulet's actual injuries following Green's use of force and

18  argues that this means the amount of force used was not substantial, unlike in *Rice* and *Andrews*.

19  *See* Opp'n at 21–22.  Green points out that Hulet has not provided any "objective findings of

20  significant injury" because Hulet provides his post-incident medical records, which only show

21  that he complained of severe pain to his doctor and was prescribed medication and treatment for

22  that pain.  *Id.* at 22.

23      The "presence of non-minor physical injuries [following an officer's use of force] . . . [is]

24  relevant in evaluating the degree of Fourth Amendment intrusion."  *Bryan*, 630 F.3d at 824–25.

25  However, the "extent of a detainee's injuries [following the use of force] fits into [the] equation

26  [only] indirectly."  *Bell v. Williams*, 108 F.4th 809, 821 (9th Cir. 2024).  "A detainee's injuries

27  may indicate, albeit imperfectly, the amount of force that was used to cause them."  *Id.*  In other

28  words, the extent of injuries may serve "as a proxy for the force used."  *Id.*  Here, the Court need

1    not rely on such a proxy because there is video evidence of the force that Green used against

2    Hulet.  Regardless of the extent of Hulet's after-the-fact injuries, the take-down was a substantial

3    use of force which "must be justified by the need for the specific level of force employed."  *Rice*,

4    989 F.3d at 1121.[4]

5           **2.  Governmental Interest**

6           The need for the government's use of force is determined by a number of factors,

7    including "'(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate

8    threat to the safety of the officers or others . . . (3) whether he [was] actively resisting arrest or

9    attempting to evade arrest by flight,' and any other 'exigent circumstances [that] existed at the

10   time of the arrest.'"  *Deorle*, 272 F.3d at 1280 (quoting *Humboldt I*, 240 F.3d at 1189–99).

11   However, these factors are non-exhaustive and a court should consider the totality of the

12   circumstances.  *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir. 2013).  It bears

13   repeating that "it is the *need* for force which is at the heart of the analysis."  *Nelson*, 685 F.3d at

14   878 (quoting *Humboldt II*, 276 F.3d at 1130).  The Court therefore examines a range of

15   considerations under this prong.

16           i.    Immediate Threat

17           "The 'most important' factor is whether the [detainee] posed an immediate threat."  *Scott*

18   *v. Smith*, 109 F.4th 1215, 1224 (9th Cir. 2024) (quoting *Rice*, 989 F.3d at 1121–22); *see Calonge*

19   *v. City of San Jose*, 104 F.4th 39, 45 (9th Cir. 2024).  In assessing whether there was an

20   immediate threat, the Court must use "objective factors" to guide the analysis.  *See Deorle*, 272

21   F.3d at 1281.  A "simple statement by an officer that he fears for his safety or the safety of others

22   is not enough."  *Id.*  "An immediate threat might be indicated by 'a furtive movement [for a

23   weapon], harrowing gesture, or serious verbal threat.'"  *Calonge*, 104 F.4th at 46 (quoting *George*

24   *v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)).  The Court therefore must examine whether Hulet

---

25   [4]  Additionally, in *Rice*, the Ninth Circuit held that the take-down used there was a "substantial"
26   and "aggressive" use of force even though the plaintiff did not produce any findings of injury
     from a doctor.  *See Rice*, 989 F.3d at 1121.  In *Rice*, the plaintiff submitted only his declaration
27   which stated that he "suffered 'extreme pain' immediately following his arrest and long-term
     physical pain for which he received medical treatment."  *Id.*  Accordingly, objective findings of
28   significant injury are not, as Green urges, required to conclude that the force used was substantial.

1    posed an immediate threat to the officers.

2         As can be seen from the video footage, Hulet entered the cell, then turned to face the

3    officers once he reached the back wall.  Safety Cell Footage at 00:28–01:40.  Green stood directly

4    in the doorway, and Holt, Graziose, Hedgpeth, and Benson stood near his shoulder, giving

5    instructions to Hulet.  *Id.*; *see* Benson Body Cam Footage at 01:12:43–01:13:55.  As Holt

6    explained to Hulet that he was required to strip, Hulet placed his hands on his hips and said "no"

7    twice.  *Id.*  When Holt reiterated her command that he must strip, Hulet took a step forward, now

8    within arm's reach of Green, and raised his voice to say, "I'm not losing my dignity."  *Id.*  As he

9    stepped forward, he bent his right arm at the elbow, with his thumb pointing toward the ceiling

10   and other four fingers closed, arguably in a fist, and he began shaking his hand as he spoke.

11   Safety Cell Footage at 01:24–01:31.  Green held out his hand and told Hulet to "back up,"[5] but

12   Hulet did not immediately back up.  *See* Doc. 43-4 ("Green Decl.") ¶ 8.  About six seconds after

13   Hulet took the step forward, Green advanced toward him and Hulet immediately stepped back.

14   Safety Cell Footage at 01:30–01:33.  Green attempted to grab Hulet's right hand as he advanced,

15   then wrapped his arm around Hulet's neck briefly and turned Hulet.  *See* Safety Cell Footage at

16   01:30–01:37.  Green claims that Hulet tensed up and resisted him, Green Decl. ¶ 7, which Hulet

17   denies, Doc. 46-1 ¶¶ 29–30, 33, 35.  Green then grabbed Hulet's legs, raised them above Hulet's

18   body, and flipped Hulet onto the concrete floor on his back.  *See* Safety Cell Footage at 01:30–

19   01:37.

20         The parties dispute how Hulet's hand gesture and body language are to be interpreted

21   during this exchange.  Green argues that he believed Hulet made a fist and was "physically

22   intimidating the officers."  Opp'n at 13.  Hulet argues that he was simply making a hand gesture

23   to accentuate his verbal remark, "I'm not losing my dignity," and only took a step forward

24   because he was speaking to Holt, who was behind Green.  Reply at 10.  Green also asserts that he

25   flipped Hulet onto the ground because Hulet had tensed up and resisted him when Green first

26   _____

27   [5]  Green's command to "back up" is not audible in the video.  *See* Benson Body Cam Footage at
     01:13:27–01:13:44; Safety Cell Footage at 01:24–01:31.  However, Green's hand motion on the

28   video is consistent with giving such a command, *see* Safety Cell Footage at 01:24–01:31, and a
     reasonable jury could conclude that he told Hulet to back up, as Green asserts.

1    grabbed him in the cell.  Green Decl. ¶ 7.

2           This encounter was captured on video, and in such a situation, the Court must "view[] the

3    facts in the light depicted by the videotape."  *Scott v. Harris*, 550 U.S. 372, 381 (2007).

4    However, the "existence of video footage of the incident does not foreclose a genuine factual

5    dispute as to the reasonable inferences that can be drawn from that footage."  *Vos*, 892 F.3d at

6    1028; *see also Deorle*, 272 F.3d at 1281 ("A thorough review of the record reveals that the facts

7    are sufficiently unclear as to what [the officer] believed or feared—reasonable or not—that the

8    determination must be made by a trier of fact.").  The Court's task is therefore to determine

9    whether a reasonable jury could conclude – while bearing in mind the totality of the

10   circumstances – that Hulet made a fist and was poised to strike Green, then tensed up and resisted

11   Green's effort to control him when Green initially grabbed him in the cell, and that Green

12   reasonably perceived this as a threat.

13          There is enough in the record to permit a reasonable jury to draw the inference that Green

14   reasonably believed that Hulet, by clenching his hand and advancing toward the officer, presented

15   an immediate threat.  Although Hulet's thumb was sticking out and his arm was bent at the elbow

16   and extended slightly forward, rather than drawn back as if he were about to throw a punch, four

17   of Hulet's fingers were clenched and he was within arm's reach of Green.  Coupled with Hulet's

18   raised voice and his failure to comply with Green's command to back up, a reasonable jury could

19   conclude that a reasonable officer would have perceived Hulet's conduct as a threat and would

20   have believed Hulet might strike Green.  Therefore, when drawing this inference in Green's

21   favor, Hulet presented an immediate threat.

22                  ii.    Resistance

23          The Ninth Circuit draws a distinction between passive and active resistance.  *Bryan*, 630

24   F.3d at 830.  Resistance is not "a binary state," but rather, "runs the gamut from the purely

25   passive protestor who simply refuses to stand [at an officer's command], to the individual who

26   physically assault[s] [an] officer."  *Id.*  "Even purely passive resistance can support the use of

27   some force, but the level of force an individual's resistance will support is dependent on the

28

1  factual circumstances underlying that resistance." *Id.*

2        Viewing the facts in the light most favorable to Green, a reasonable jury could conclude

3  that Hulet actively resisted Green.  Hulet said he would not comply with officers' commands to

4  strip naked.  Benson Body Cam Footage at 01:13:26–01:13:46.  Additionally, viewing the facts in

5  the light most favorable to Green, Hulet refused a command to back up, *see* Green Decl. ¶ 8.

6  Green further asserts that, when he physically contacted Hulet, Hulet "pulled away," and Green

7  "could feel and observe [Hulet physically] resisting . . . ."  Green Decl. ¶ 7; Doc. 46-1 ¶¶ 29–30,

8  33, 35.  Although Hulet disputes that he physically resisted, *see* Doc. 46-1 ¶¶ 29–30, 33, 35, a

9  jury could reasonably reach the opposite conclusion.  Jurors could credit Green's testimony that

10  he could feel Hulet pulling away from him when Green first grabbed Hulet in the cell, *Porter v.*

11  *Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005) ("[T]he court does not make credibility

12  determinations or weigh conflicting evidence [in resolving a motion for summary judgment].").

13  A jury could, accordingly, conclude that Hulet actively resisted.  *See Mattos v. Agarano*, 661 F.3d

14  433, 446 (9th Cir. 2011) (concluding that arrestee "actively resisted" when she "refused to get out

15  of her car[,] stiffened her body[,] and clutched her steering wheel to frustrate the officers'

16  efforts.").

17        iii.    Other Relevant Factors

18     **Mental Illness.**  On numerous occasions, the Ninth Circuit has explained that "where it is

19  or should be apparent to the officers that the individual involved is emotionally disturbed, that is a

20  factor that must be considered in determining, under *Graham,* the reasonableness of the force

21  employed."  *Deorle*, 272 F.3d at 1283; *see, e.g.*, *Scott v. Smith*, 109 F.4th at 1224.  "The problems

22  posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught

23  individual who is creating a disturbance or resisting arrest are ordinarily different from those

24  involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently

25  committed a serious offense."  *Bryan*, 630 F.3d at 829 (quoting *Deorle*, 272 F.3d at 1282–83).

26  Although the Ninth Circuit has not outlined "two tracks of excessive force analysis, one for the

27  mentally ill and one for serious criminals, [it has] found that even 'when an emotionally disturbed

28  individual is acting out and inviting officers to use deadly force to subdue him, the governmental

interest in using such force is diminished by the fact that the officers are confronted[,] [not with a person who has committed a serious crime against others, but] with a mentally ill individual.'" *Bryan*, 630 F.3d at 829 (quoting *Deorle*, 272 F.3d at 1282–83). After all, "increasing the use of force may, in some circumstances at least, exacerbate the situation," whereas a "waiting period [could] diffuse a potentially violent situation and prevent [harm]." *Deorle*, 272 F.3d at 1283 & n.21.

Green was aware that Hulet was experiencing mental health problems. Right before Green took Hulet to the ground, the officers placed Hulet in a safety cell and demanded that he put on a "safety smock" because they believed he presented a risk of suicide. UF ¶¶ 14, 66–78; Benson Body Cam Footage at 01:13:26–01:13:45. Furthermore, as Green argues in his opposition, Hulet "became hostile and unpredictable during the booking process. [He] would cooperate in one moment, but then become combative and frustrated in the next. [He] would yell [and curse]" at the officers. Opp'n at 13. It was thus "apparent to [Green and] the [other] officers that the individual involved was emotionally disturbed." *Deorle*, 272 F.3d at 1283. "In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* Green had received training in de-escalation techniques, UF ¶ 98, but declined to use that training. These considerations diminish the need for force. *See Bryan*, 630 F.3d at 829 (quoting *Deorle*, 272 F.3d at 1282–83).

**Availability of Less Intrusive Alternatives.** The Ninth Circuit has noted that "police are required to consider what other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding the use of force reasonable." *Nehad*, 929 F.3d at 1138; *see Deorle*, 272 F.3d at 1282 ("Nothing in the record before us suggests that [the officer] considered other, less dangerous, methods of stopping [the suspect].").

Hulet argues that he did not present an immediate threat and did not resist, so multiple alternatives were available. MSJ at 15–16. For example, Hulet asserts that the officers could have closed the door and monitored him through the video feed if they were worried that his

clothing presented a safety threat.  Reply at 14.  However, taking all inferences in favor of Green, Hulet presented a threat to strike him and then physically resisted when Green first made physical contact with him.  The alternatives identified by Hulet are therefore inapplicable.

**Warnings.**  The Ninth Circuit has also held that the "giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."  *Nelson*, 685 F.3d at 882 (internal citation omitted).  "The seemingly obvious principle that police should, if possible, give warnings prior to using force is not novel, and is well known to law enforcement officers." *Nehad*, 929 F.3d at 1137.  Therefore, "warnings should be given, when feasible, if the use of force may result in serious injury."  *Deorle*, 272 F.3d at 1284.

Here, one warning was given.  After Hulet initially refused the officers' commands that he strip, Holt responded, "Well, we're going to have to take them off for you, if you're not giving them up."  UF ¶ 70; Benson Body Cam Footage at 01:13:26–01:13:45.  Hulet was therefore cognizant that force might be used against him if he did not comply.

However, the significance of Holt's warning is undermined by other considerations. Courts have explained that the giving of a warning is not simply a box to be checked; the pertinent question is whether the warning was "appropriate."  *See Kaur v. City of Lodi*, 236 F. Supp. 3d 947, 968 (E.D. Cal. 2017) ("*[A]ppropriate warnings* . . . should be given, when feasible, if the use of force may result in serious injury." (quoting *Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (emphasis in original)).  Holt's warning did not indicate that force would be used imminently.  Only seconds passed between the moment she gave the warning and Green entering the cell and taking Hulet down.  Benson Body Cam Footage at 01:13:31–01:13:48.  Her warning also did not suggest what level of force the officers would use if he did not comply.  *Id.* Additionally, Green did not give a warning that he was about to take Hulet to the ground.  *See id.*

### 3.  Balancing

"The factors that justify the use of force must be weighed against the degree of intrusion posed by the particular type of force to determine if the use in the particular instance was reasonable."  *Nelson*, 685 F.3d at 883.  As noted above, viewing the facts in the light most favorable to Green, Hulet posed an immediate threat and actively resisted, and a jury could find

1   that Green's use of force was reasonable under the circumstances.  Construing all inferences in

2   the light most favorable to Green, a reasonable jury could find "the threat reasonably perceived

3   by the officer," Hulet's active resistance, and the lack of less intrusive alternatives justified

4   Green's use of force.  As a reasonable jury could find the takedown was not unconstitutionally

5   excessive, Hulet's motion for summary judgment is denied.

6          **b.  Whether Green Is Entitled to Qualified Immunity**

7          The Court now turns to Green's affirmative defense of qualified immunity.  Qualified

8   immunity shields "government officials 'from liability for civil damages insofar as their conduct

9   does not violate clearly established statutory or constitutional rights of which a reasonable person

10  would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.*

11  *Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "balances two important interests—the need

12  to hold public officials accountable when they exercise power irresponsibly and the need to shield

13  officials from harassment, distraction, and liability when they perform their duties reasonably."

14  *Id.*  An officer may be denied qualified immunity only if "(1) the [evidence], taken in the light

15  most favorable to the party asserting injury, show[s] that the officer's conduct violated a

16  constitutional right, and (2) the right at issue was clearly established at the time of the incident

17  such that a reasonable officer would have understood her conduct to be unlawful in that

18  situation."  *Calonge*, 104 F.4th at 44 (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th

19  Cir. 2011)).

20              i.   Constitutional Violation

21         As explained previously, there are several genuinely disputed factual issues, such as

22  whether Green told Hulet to back up, whether Hulet was threatening to strike Green and thus

23  presented an immediate threat, and whether Hulet pulled away and actively resisted Green's

24  initial attempt to control him.  Accepting Hulet's version of each of these factual disputes, the

25  jury could find Green's use of substantial force was unreasonable.

26         The jury could, from the evidence, reasonably accept Hulet's version of those facts.  First,

27  a jury could conclude that Green never verbally told Hulet to back up.  While Green states in his

28  declaration that he told Hulet to back up, Green Decl. ¶ 8, the command is not audible in the

1  video footage recording the entire interaction, nor did Hulet visibly react as if he had been told to

2  back up.  *See* Benson Body Cam Footage at 01:13:27–01:13:44; Safety Cell Footage at 01:24–

3  01:31.  The jury's resolution of such a dispute will involve assessing the credibility of Green's

4  testimony on this issue, and "the court does not make credibility determinations or weigh

5  conflicting evidence" in resolving a motion for summary judgment.  *Porter v. Cal. Dep't of Corr.*,

6  419 F.3d 885, 891 (9th Cir. 2005).

7        Second, the jury could also conclude that a reasonable officer would not have perceived

8  Hulet as an immediate threat based on Hulet's conduct.  Hulet bent his right arm at the elbow so

9  that his right hand was extended slightly outward, with his thumb pointing up and four fingers

10  closed.  *See* Safety Cell Footage at 01:24–01:31.  Hulet points out that he was speaking to Holt,

11  who was standing behind Green, not addressing Green.  Safety Cell Footage at 01:24–01:31.  The

12  jury could conclude Hulet was not making a fist.  *See* Safety Cell Footage at 01:24.  In addition,

13  Hulet's arm was not drawn back as if he was about to throw a punch.  *See id.*  The jury could

14  conclude that a reasonable officer would not have perceived this hand gesture and body language

15  as a threat to punch Green.

16        Green further argues that, when he advanced toward Hulet and Hulet backed up, he could

17  "sense that [Hulet] had moved his body in a position that might [] allow him to strike Green."

18  Opp'n at 14.  But what Hulet hypothetically *could have* done is not the question: the question is

19  whether a reasonable officer would have seen him as an immediate threat.  *See Deorle*, 272 F.3d

20  at 1281.  "[A] simple statement by an officer that he fears for his safety is not enough; there must

21  be objective factors to justify such a concern."  *Id.*  The recording in the safety cell shows that

22  Green immediately placed his left arm around Hulet's neck, and then switched to lift Hulet's legs

23  in the air and flip him to the floor on his back.  Safety Cell Footage at 01:29–01:33.  Viewing the

24  video evidence, a jury could conclude that Hulet did not present a threat to Green when Green

25  took those actions.

26        Third, a jury could conclude that Hulet did not actively resist Green when he contacted

27  Hulet.  While Green claims that he could feel Hulet resisting and pulling away from him, Green

28  Decl. ¶ 8, Hulet asserts that he did not resist or pull away, *see* Doc. 46-1 ¶¶ 29–30, 33, 35.  The

1    video does not resolve this material dispute of fact.  It is not clear from the video evidence

2    whether Hulet initially resisted when Green placed him in a headlock.  The video evidence is

3    indeterminate, and a jury could conclude that Hulet did not actively resist at that point, but rather,

4    had only passively resisted by refusing officers' commands to strip before Green made physical

5    contact.

6        If Hulet did not present an immediate threat, the officers "were required to consider what

7    other tactics if any were available, and if there were clear, reasonable and less intrusive

8    alternatives to the force employed, that militate[s] against finding the use of force reasonable."

9    *Nehad*, 929 F.3d at 1138; *see Deorle*, 272 F.3d at 1282 ("Nothing in the record before us suggests

10   that [the officer] considered other, less dangerous, methods of stopping [the suspect].").  Hulet

11   lists numerous alternatives to taking him to the ground and stripping his clothes from him, and he

12   argues that the officers could have employed those peaceful alternatives to quell their concern

13   that Hulet might harm himself.  *See* MSJ at 15–16.  For example, Hulet urges, Green or the other

14   officers could have closed the door and continued to observe Hulet in his cell through either the

15   window or closed-circuit video feed if they were worried that his clothing presented a safety

16   issue.  MSJ at 16.

17       Green contends that this was not a reasonable alternative because the jail houses over 100

18   inmates, all of whom may have required the attention of the officers who were on duty at that

19   time.  Opp'n at 12 (citing Doc. 43-5 ("Graziose Decl.") ¶¶ 3–4).  He argues that Hulet's proffered

20   alternative of monitoring him in his cell "ignores the practical realities of managing a jail facility"

21   because the other inmates had their own needs, such as food, water, and time outside the cell.  *Id.*

22   Indeed, the Court "must consider the 'legitimate interests that stem from the government's need

23   to manage the facility in which the individual is detained, appropriately deferring to policies and

24   practices that in the judgment of jail officials are needed to preserve internal order and discipline

25   and to maintain institutional security.'"  *Hyde v. City of Wilcox*, 23 F.4th 863, 870 (9th Cir. 2022)

26   (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

27       Nonetheless, Green's argument that the officers' *only* option was to immediately use

28   substantial force on Hulet, even without an immediate exigency, is not persuasive.  Green fails to

19

1    identify any specific, immediate concern demanding the officers' attention at that moment, other

2    than Hulet.

3        Green primarily relies on *Hyde v. City of Wilcox*, 23 F.4th 863 (9th Cir. 2022), to argue

4    that the officers' use of force was justified by a need to maintain security, rendering other

5    alternatives impractical.  In *Hyde*, the detainee charged toward the closed door of his cell, fell to

6    the floor, and injured his head.  *Id.* at 868.  When officers opened the door to check on him, he

7    first walked out of the cell calmly, "but then sprinted through the booking area and into the

8    female cell area," successfully evading three officers who tried to stop him.  *Id.*  When he reached

9    a dead end, officers deployed their tasers at him.  *Id.*  He fell to the ground and officers "heaped

10   onto" him, but he continued to "violently scuffle[]" with them.  *Id.* at 868, 870.  After two more

11   officers arrived, one of the officers "delivered eleven close-fisted peroneal strikes to Hyde's legs

12   [so that] other officers [could fasten] leg irons on him."  *Id.* at 868.  Applying prior precedent

13   involving tasers, the *Hyde* court concluded that this constituted intermediate force.  *Id.* at 870.

14   Weighing that against the fact that "Hyde violently scuffled with the officers," successfully

15   evaded the officers for some time, and forced the officers to make "split-second judgments" in an

16   environment where they needed to "maintain institutional security," the court concluded that the

17   officers' use of tasers and peroneal strikes was not excessive.[6]  *See id.* at 870–71.

18       The situation faced by the officers in *Hyde* is markedly different from the situation at

19   hand.  In *Hyde*, the officers faced an exigency that made less intrusive alternatives unfeasible.  *Id.*

20   In contrast, Hulet was confined to a cell, had not attempted to flee, and had not injured himself.

21   Construing the evidence in the light most favorable to Hulet, "the force used was not required by

22   exigent circumstances" and the officers were "not forced to make a 'split-second' decision," so

23   there was a need to consider reasonable, less intrusive alternatives, if available.  *See Bell*, 108

24   F.4th at 823 (quoting *Kingsley*, 576 U.S. at 399).

25       Hulet's proffered alternative – closing the door to the safety cell and monitoring him

26   through the window or the video feed – presumably would have required an officer to focus

27

28   [6]  The court also noted that the officers did not know that they were dealing with a mentally ill
     individual rather than a dangerous criminal.  *See id.* at 870–71.

1  attention on Hulet for some period of time.  Requiring an officer to focus all her attention on one

2  detainee might be unreasonable if that detainee were to be held for a lengthy period, but Hulet

3  was brought to the jail to resolve a misdemeanor warrant and was told several times that he would

4  be released in a matter of hours.  *See, e.g.*, Benson Body Cam Footage at 00:29:39–00:29:43.

5  Given the lack of any proffered exigency during Hulet's stay, this was a reasonable, less intrusive

6  alternative that the officers failed to consider.[7]

7      Even if actively monitoring Hulet through the window or through the safety cell video

8  feed were impractical, other reasonable, less intrusive alternatives were available.  The officers

9  could have engaged with Hulet for longer than twenty seconds before entering his cell.  Benson

10  Body Cam Footage at 01:13:26–01:13:45.  Given Hulet's stated concern with "losing [his]

11  dignity," the officers could have "permitted Hulet to disrobe out-of-sight of the female jail staff."

12  Reply at 14–15.  Alternatively, they could have "contacted a higher-authority superior for advice

13  and tactics on how to proceed with Hulet," or, considering that they believed he was suicidal,

14  "contacted mental/behavioral health staff [who are] specially trained to speak with persons in a

15  state of mental distress."  *Id.*; *Deorle*, 272 F.3d at 1282–83 ("In the case of mentally unbalanced

16  persons, the use of officers and others trained in the art of counseling is ordinarily advisable,

17  where feasible, and may provide the best means of ending a crisis. . . . [Officers] had . . . the

18  opportunity for alternative actions, including "consult[ing] with . . . superiors concerning the

19  tactics to be employed," a "clear line of escape from the position assumed" if danger were

20  present, and "awaiting the arrival of skilled negotiators, trained to persuade individuals like [the

21  plaintiff] to submit peacefully.")).  Nothing in the record indicates that the officers considered any

22  such alternatives.

23      Viewing the facts in the light most favorable to Hulet, Green was presented with a

24  mentally ill detainee who presented no immediate threat, was unarmed, was isolated in a cell with

---

25  [7]  The Ninth Circuit has explained that the "governmental interests at stake are limited" when
26  officers assert a need to put a detainee in a "suicide smock," even when the detainee is "verbally
    antagonistic and reluctant to cooperate."  *Meske v. Renzelman*, 749 Fed. App'x 496, 497–98 (9th
27  Cir. 2018).  In that case, the officers were also not faced with any identifiable exigency since the
    detainee "was being held under their control at the police station."  *Id.* at 498.  Although *Meske* is
28  an unpublished opinion and non-binding, its reasoning is pertinent to this analysis and persuasive.

1    five officers standing outside the doorway, had committed only misdemeanor vehicle infractions,

2    and engaged in only passive resistance for about twenty seconds by refusing officers' commands

3    to strip.  On these facts, the need for force was insubstantial.  *See Nelson*, 685 F.3d at 881.

4        "The factors that justify the use of force must be weighed against the degree of intrusion

5    posed by the particular type of force to determine if the use in the particular instance was

6    reasonable."  *Nelson*, 685 F.3d at 883.  Construing the evidence in the light most favorable to

7    Hulet, the only governmental interest involved in the use of force was Hulet's passive resistance

8    and the officers' desire to gain quick compliance with their orders.  "Although the officers plainly

9    had an interest in [gaining compliance with their orders], the desire to do so quickly, in the

10   absence of any actual exigency, cannot legitimize the application of force when it is not otherwise

11   justified."  *Id.* at 880 (citing *Deorle*, 272 F.3d at 1281).  Similarly, passive resistance plainly does

12   not "justif[y] the application of a non-trivial amount of force."  *Nelson*, 685 F.3d at 881.  As

13   substantial force was used against Hulet, Green's takedown would be unconstitutionally

14   excessive if the evidence is construed in the light most favorable to Hulet.

15           ii.  Clearly Established Law

16       Construing the evidence in the light most favorable to Hulet, Green's physical takedown

17   of Hulet violated clearly established law.  "The law is clearly established when precedent is 'clear

18   enough that every reasonable official would interpret it to establish the particular rule the plaintiff

19   seeks to apply.'"  *Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024) (quoting *D.C. v.

20   Wesby*, 583 U.S. 48, 63 (2018)).  "Although '[the Supreme] Court's caselaw does not require a

21   case directly on point for a right to be clearly established, existing precedent must have placed the

22   statutory or constitutional question beyond debate.'"  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)

23   (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017)).  "The rule must be settled law, which means

24   it is dictated by controlling authority or a robust consensus of cases of persuasive authority."

25   *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (internal quotation marks omitted).  The

26   Court may "rely on the intersection of multiple cases when holding that a constitutional right has

27   been clearly established."  *Polanco v. Diaz*, 76 F.4th 918, 930 n.8 (9th Cir. 2023) (citing *Ioane v.

28   Hodges*, 939 F.3d 945, 957 (9th Cir. 2018) ("Taken together, the holdings from [four prior cases]

1  put the unlawfulness of [the officer's] conduct beyond debate.")).

2          *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001), *Andrews v. City of Henderson,* 35

3  F.4th 710, 716 (9th Cir. 2022), and *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021), put

4  the constitutional question beyond debate.  It has long been established that police

> should know that it is objectively unreasonable to [use substantial,
> non-lethal force against] an unarmed man who: has committed no
> serious offense, is mentally or emotionally disturbed, has been given
> no warning of the imminent use of [] a significant degree of force,
> poses no risk of flight, and presents no objectively reasonable threat
> to the safety of the officer or other individuals.

9  *Deorle*, 272 F.3d at 1285; *see also Bryan*, 630 F.3d at 832 (rejecting the use of intermediate force

10  in a "tense, but static, situation" in which the individual "was neither a flight risk, a dangerous

11  felon, nor an immediate threat").  *Rice* and *Andrews* both held that takedown maneuvers

12  analogous to the one here constituted substantial uses of force.  *See Rice*, 989 F.3d at 1121;

13  *Andrews,* 35 F.4th at 716.   *Rice* also held that *Deorle*, *Humboldt II*, and *Bryan* clearly establish

14  that it is unreasonable to perform a take-down which amounts to substantial force on a person

15  who only passively resists by refusing to comply with officers' orders and does not pose an

16  immediate threat.  *See Rice*, 989 F.3d at 1121, 1125–26; *see also Andrews,* 35 F.4th at 716, 718–

17  19 (holding that several cases, but primarily *Blankenhorn*, clearly establish that it is unreasonable

18  to perform a take-down which amounts to substantial force when "the suspect is not posing an

19  immediate danger to anyone, resisting arrest, or trying to flee[,] unless the officers first attempt a

20  less intrusive means of arrest").  Accordingly, Green is not entitled to qualified immunity.

21  **IV.    Conclusion and Order**

22          Based upon the foregoing:

23      1.  Hulet's motion for summary judgment, Doc. 37, is **DENIED**.

24      2.  Green is not entitled to qualified immunity.

27  IT IS SO ORDERED.

28      Dated:    April 14, 2025

UNITED STATES DISTRICT JUDGE

23